UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES

       -against-                                   21 CR 299 (JMF)

TRACII HUTSONA
-------------------------------------------------------x

## TRACII HUTSONA'S
## SENTENCING MEMORANDUM

Deborah Colson
Moskowitz Colson Ginsberg & Schulman
80 Broad Street, Suite 1900
New York, N.Y. 10004

*Attorney for Tracii Hutsona*

# LETTER EXHIBITS

| | |
|---|---|
| Tracii Hutsona | A |
| Michelle Stanton (sister) | B |
| Gabrielle Show (daughter) | C |
| Derrell Hutsona (husband) | D |
| LeDonna Spongberg (friend) | E |
| Chanel Williams (employee) | F |
| Marissa Louvau (employee) | G |
| Rev. Dr. David Hatch (Prison Fellowship) | H |
| Carleton Overstreet (San Diego Hip Hop 5K) | I |
| Pete Coleman (Pete's Kitchen Inc.) | J |
| Dan Dismuke (employee) | K |
| Laura Della Ripa (stepson's mother) | L |
| Rodney Hutsona (father-in-law) | M |
| Kalli Seely (friend) | N |
| Jennifer Rotter (friend) | O |

# I.
# INTRODUCTION

The disconnect between Ms. Hutsona's prior criminal conduct and more recent accomplishments is hard to understand and, for some, hard to accept. Why should this Court exercise leniency for a repeat offender, and how can it be confident she will not err again? The answer is simple: Ms. Hutsona finally has something to be proud of—a legitimate and thriving restaurant business she has built herself and can call her own.

Joumana Kidd terminated Ms. Hutsona in September 2019, but she was not charged right away. Eighteen months passed between her falling out with Joumana and her arrest for the instant offense in March 2021. During that time, Ms. Hutsona turned her life around and did so entirely on her own initiative. In 2019 and 2020, she and her husband Derrell Hutsona opened two restaurants; then, through sheer grit and determination, they kept them open during the pandemic. Between the two locations, they now employ more than 100 people. Ms. Hutsona is also helping to raise her seven-year old stepson, ▇▇▇▇. She and Derrell share custody with Londyn's mother and provide him with significant financial support.

Ms. Hutsona accepts full responsibility for her misconduct and recognizes that she must be punished. At the same time, the Court is "required, as a procedural matter, to consider evidence" of rehabilitation in deciding what sentence to impose. *United States v. Preacely,* 628 F.3d 72, 81 (2d Cir. 2010); *see also United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000) ("a court's duty is always to sentence the defendant as [s]he stands before the court on the day of sentencing."). Ms. Hutsona has harnessed the shame and humiliation she experienced as result of her offense to propel herself forward. She is humbled by her misdeeds and newly equipped to live a productive and law-abiding life. Her sentence should reflect the efforts she has made.

2

II.

**PERSONAL HISTORY AND OFFENSE CONDUCT**

Looking back, Ms. Hutsona believes her parents' poor money management instilled in her a deep sense of financial insecurity that began when she was a child and continues to this day. Her parents, who both worked in real estate, "lived in feast or in famine." PSR ¶ 68. Ms. Hutsona recalls one summer when they closed a big real estate deal and took her and her sisters on vacation to France and Italy. *Id.* When they got home, the electricity had been turned off for non-payment. *Id.* According to Ms. Hutsona's sister, Michelle, whenever the real estate market took a downturn, their father would sell drugs. Michelle describes one occasion in particular when some of Ms. Hutsona's friends pulled up in front of their family's home, hoping to purchase marijuana. Ex. B. "Tracii just ducked, she was mortified and did not want anyone to know that was her house," writes Michelle. *Id.* Ms. Hutsona's father also had a drinking problem, which impacted his ability to support the family. Sometimes her would "go on a bender" and disappear from home for days. PSR ¶ 65.

When Ms. Hutsona was fourteen, she was scouted by a modeling agency and signed a contract to spend her summers modeling in Japan. PSR ¶ 66. The money she earned impressed and pleased her parents, especially her mother who eventually encouraged Ms. Hutsona to buy a car, then boasted about it to family and friends. *Id.* Ms. Hutsona did not realize until years later that she never really enjoyed modeling and that she stuck it out for years as a means of gaining her parents' love and attention.

Her first marriage in her mid-twenties to Paul Vician followed a similar pattern. Paul was a talented musician who played in a rock band. He was also unfaithful and physically abusive. PSR ¶ 72. "I fell for a façade of lies and ended up marrying him in 1995, when I was six months

3

pregnant with my daughter [Gabrielle]," writes Ms. Hutsona. Ex. A. Two years later, they had a son named Stevin. PSR ¶ 71. Without steady jobs or a consistent source of income, "[e]verything in our lives was hectic and filled with drama." Ex. A. Indeed, they repeatedly found themselves in trouble. They were accused of stealing a refrigerator and a car, then of writing several bad checks. PSR ¶¶ 47-51. Looking back, Ms. Hutsona believes she hustled with Paul for the same reason she modeled as a teenager. She was terrified of abandonment and mistakenly believed that money could buy her love and commitment.

In 2009, Ms. Hutsona pled guilty to fraud in the Central District of California and received a 75-month sentence. PSR ¶ 53. When she entered prison in 2009, Gabrielle was just 13 and Stevin was 11. When she was released in 2014, Gabrielle was a senior in high school and Stevin was a sophomore. Ms. Hutsona remains traumatized to this day by the hardship she caused her children during their formative teenage years. "I served 5 years and left my children to fend for themselves," she writes. Ex. A. As a family, "we would never be the same after this." *Id.*

Upon her release, Ms. Hutsona was determined to do better, but it was "harder than [she] ever expected." Ex. A. "I needed to rebuild my bond with my children. I needed to earn a living to support us. I got a job, but once they learned of my criminal history, I lost it." *Id.* Gabrielle recalls her mother's "tenacity" in those days. Ex. C. "[W]ith no money in her pocket and a broken-down car that smelled like poop," Ms. Hutsona drove around the city, searching unsuccessfully for employment. *Id.* Eventually, she realized she had no choice but to start her own business. She opened a concierge company called Elite Lux Life and began booking vacation rentals and luxury cars. PSR ¶ 98. Later that year, she met her future husband, Derrell and they joined forces in recruiting Elite Lux clients. Although they threw themselves into the

4

business, it never turned much of a profit partly because the cars they leased were expensive and lay fallow most of the week.

In late 2015, Joumana Kidd hired Ms. Hutsona as a part-time personal assistant. Ms. Hutsona had not intended to provide personal assistant services through Elite Lux Life, but she agreed because she needed the money. She began helping Joumana to chauffer her children around the city and with errands and bills. Months into the job, she found herself falling victim to old temptations. "Joumana was loose with her finances," explains Ms. Hutsona, "and I am so ashamed to admit that I took advantage of that." Ex. A. In February 2016, without asking Joumana's permission, she applied for a credit card linked to Joumana's bank account and began using the card for personal items and expenses, including travel and hotels. PSR ¶ 13. Her conduct progressed from there. She rationalized her behavior by telling herself that she would eventually pay Joumana back. After she came clean with Joumana in September 2018, she did return more than $50,000. *Id.* at ¶ 16, n. 1. But she continued spending money as well.

The Probation Department surmises that Ms. Hutsona acted purely out of greed. PSR, Sentencing Recommendation Justification, at 36. Gabrielle, on the other hand, posits that her mother's conduct was more complicated than that. "It might sound silly, but my mom doesn't care that much about money," she writes. Ex. C. "I think that all she wants out of life is to be loved." *Id.* Ms. Hutsona, herself, attributes her behavior to the financial insecurity she experienced as a child. She recognizes, however, that nothing justifies her offense. She knows that what she did was wrong and "regret[s] it deeply." Ex. A. "I accept responsibility and understand that I need to be held accountable for my actions," she writes. *Id.* "I want to continue contributing to society and pay my debts." *Id.* Gabrielle says her mother "has shown sincere remorse for actions in her life and accepts that she has made mistakes." Ex. C. "I wish you could

5

spend a week with her," adds Derrell, "just to see the type of person she is and the things she does." Ex D. "She is a whole team within herself. The mom, the manager, the hardest working woman that I've ever seen." *Id.*

### III.

### MS. HUTSONA MERITS LENIENCY

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). This provision, known as the parsimony clause, applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a). Indeed, the command of the parsimony clause defines this Court's "overarching duty." Pepper v. United States, 131 S.Ct. 1229, 1243 (2011).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence of criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in Pepper, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper, 131 S.Ct. at 1240 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." Gall v. United States, 128 S.Ct. 586, 596-97 (2007). Rather, the judge is

6

directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." Id. at 597.

Here, several factors warrant the Court's leniency.

<u>First</u>, Ms. Hutsona has engaged in impressive post-offense rehabilitation. In late 2019—more than a year *before* the instant arrest—she and her husband, Derrell opened a restaurant in San Diego, a high-end diner called Breakfast Bitch. *See.* <https://sd.eatbreakfastbitch.com/>. In 2020, they opened a sister restaurant in Phoenix. *See* <https://eatbreakfastbitchphx.com/>. The timing was difficult because of the pandemic, but they managed to keep both restaurants open by offering takeout options and instituting regular Covid testing for their employees. Ex. A. Today the restaurants are thriving. They have been well reviewed, *see, e.g., Breakfast Bitch in Downtown Phoenix: Frankly, Not that Bitchy,* Phoenix New Times (Sept. 28, 2021); *Breakfast Bitch review,* Mesa Press (Oct. 6, 2020), and have a large contingent of loyal customers. The San Diego location recently won an award for "Best restaurant in San Diego," and the Phoenix location won "Best of your city." Ex. A. LeDonna Spongberg, a commercial real estate broker, describes Breakfast Bitch as "one of the most successful restaurants in the entire Phoenix market." Ex. E. Earlier this year, the restaurant moved into a larger space and added a sports bar and café lounge. *See* <https://www.facebook.com/profile.php?id=100087742303278>. Ms. Hutsona's long-term goal is to franchise the concept, and she is currently in negotiations with several potential franchisees.

Ms. Hutsona is involved in all aspects of the business from marketing to management; she even serves, buses tables and washes dishes when necessary. Ex. F. The work is physical, dirty and tough. The hours are grueling and she rarely has a day off, but she loves every moment.

Her employees—more than 100 of them—are her second family.[1] She knows how difficult it was for her to find work following her release from prison, and she has made a point of hiring people with criminal records and those who may not be employable "in traditional work environments." Ex. E. "She has experienced some of the same challenges," writes LeDonna, and "understands that people are worth a second chance." *Id.*

Ms. Hutsona's passion for the business is evident in her relationship with her employees, who universally describe her as hard-working, competent, thoughtful and kind. Chanel Williams, a chef in the Phoenix location, writes about Ms. Hutsona's concern for her employees during the pandemic. When the San Diego location temporarily closed, Ms. Hutsona arranged for Chanel's transfer to Arizona. "I could've just been left on unemployment in San Diego," Chanel writes, "but she [Ms. Hutsona] gave me the opportunity to keep growing with this company and to continue to have a job when that wasn't the case for most people." Ex. F. Marissa Louvau, a business manager in Phoenix, tells a similar story. She took a two-year hiatus from work when her toddler was fighting leukemia and then had difficulty re-entering the workforce. After she was turned down by several potential employers, Ms. Hutsona welcomed her with "open arms, opportunity, and support." Ex. G. "For the first time in my career," explains Marissa, "I didn't feel held back or discounted based on my gender or what I had going on at home. I have never met another person in my life that was more driven to help the people around her succeed." *Id.*

Ms. Hutsona is not only generous with her employees. She uses her platform to serve her community. Each year during the holidays, the restaurants collect gifts under a tree for the children of incarcerated parents. In late December, the staff hand delivers the gifts to the children's homes. Ex. H. This year alone, the restaurants sponsored 200 hundred needy children.

---

[1] Payroll records are available upon the Court's request.

*Id.* Ms. Hutsona also works with an organization called San Diego Hip Hop 5K, volunteering at food drives and helping to distribute laptops in public schools. Ex. I. During the pandemic, she opened her kitchen to a local chef. Ex. J. In so doing, she helped his business to survive and enabled him to continuing serving meals to the community. *Id.*

It is unsurprising given her history that Probation believes Ms. Hutsona is likely to reoffend. The truth is, however, that her circumstances have changed dramatically since she left Joumana Kidd's employ in 2019. Ms. Hutsona has built a thriving business, and she is incredibly proud of her achievements. Moreover, her rehabilitation has been entirely self-motivated. Indeed, she opened the restaurants long before her arrest. This confirms the authenticity of her objectives and substantially mitigates the risk that she will reoffend. *See United States v. Workman,* 80 F.3d 688, 701 (2d Cir. 1996) (upholding downward departure where pre-arrest rehabilitation "was not undertaken at the spur of impending prosecution for the crimes at issue.").

Ms. Hutsona's successful ownership and management of two restaurants "provide[s] the most up-to-date picture of [her] 'history and characteristics'" and merits the full extent of the Court's leniency under 18 U.S.C. § 3553(a). *Pepper,* 131 Sc.D. at 1242. *See also United States v. Williams,* 65 F.3d 301, 305 (2d Cir. 1995) (approving extraordinary rehabilitation as a permissible ground for departure); *United States v. Hawkins,* 380 F.Supp.2d 143, 165-66 (E.D.N.Y. 2005) (stating that "what a defendant is doing while free is of great significance in determining whether that defendant has made, or is in the process of making, a success of her life. Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment") (internal citation omitted); *United States v. Rosado,* 254 F.Supp.2d 316, 321 (S.D.N.Y. 2003) ("the successful rehabilitation of a criminal 'is a valuable achievement of the criminal process'") (citation omitted); *United States v. Blake,* 89 F.Supp.2d

9

328 (E.D.N.Y. 2000) (departing in bank robbery case from 87-108 months to several days in prison plus supervised release based on defendant's rehabilitation).

Second, a lengthy prison term would put Ms. Hutsona's restaurants and employees at risk. Ms. Hutsona is the "backbone" of the Breakfast Bitch business. Ex. D. While Derrell handles upkeep, maintenance and security, she is responsible for "day-to-day operations." *Id.* This includes maintaining "relationships with staff, vendors, and customers," "hiring and employee onboarding," marketing, "employee benefits and payroll, trainings, state and government compliance," and "work[in] with the county health and environmental services departments, and city planning to maintain" permits. *Id.* "I am convinced that the business and our 130+ employees will not survive without her here," Derrell writes. *Id.* "She truly is the driving force of our operation." *Id.*

Dan Dismuke, the Director of Operations, echoes the same sentiment. "The location in Arizona is held up by Tracii," he explains. Ex. K. "[W]without her guidance, double checks, and assistance" and "[i]n terms of licenses, liquor, health, rent, and even assisting the managers with scheduling and occasionally even purchases, I cannot see that place surviving without her." *Id.*

Multiple courts in this circuit have granted leniency to defendants with significant business responsibilities. *U.S. v. Malinowski,* 65 F.3d 4, 8-9 (2d Cir.1995) (affirming downward departure where defendant's incarceration would create extraordinary hardship on employees and businesses would close in his absence); *United States v. Gorodetsky,* 288 F.R.D. 248, 250 (E.D.N.Y. 2013) (granting variance and allowing co-defendants to serve sentences sequentially "so that the workers will remain employed and the defendants' families are financially supported"); *U.S. v. Khalid,* No. 09–CR–734, 2011 WL 6967993 (E.D.N.Y. Dec. 13, 2011) (sentencing considerations included defendant's ownership of several businesses employing over

a dozen individuals); *U.S. v. Romano,* No. 08–CR–76, 2008 WL 4427759, at *1 (E.D.N.Y. Sept.16, 2008) ("[Defendant] presently owns a small commercial trucking business that employs four individuals whose jobs would be at risk if he were incarcerated."). *See also U.S. v. DiMattina,* 885 F.Supp.2d 572, 589 (E.D.N.Y. 2012) (granting release pending appeal partly because defendant's "sole responsibility for his businesses—and for some 60 people they employ—argues against detention"). Like these courts, Your Honor should consider the impact of incarceration on Ms. Hutsona's business in determining what sentence to impose. Were the restaurants to close, more than a hundred people would lose their jobs.

 <u>Third</u>, Ms. Hutsona has a seven-year old stepson, ▇▇▇, who she is helping to raise. She and Derrell share custody with ▇▇▇ mother and support him financially. "Ms. Hutsona works diligently to ensure that our son spends quality time with her family as well as mine," writes ▇▇▇ mother, Laura Della Ripa. Ex. L "There has never been a time when our son has participated in any form of extracurricular activity [of which] she was not both financially and physically supportive. Ms. Hutsona is actively involved in our son's academic career and endeavors by supporting the best educational institutions possible….The thought of losing such a great role model and mother to our son is incredibly disturbing and heart breaking." *Id.* Ms. Hutsona's father-in-law, Rodney Hutsona, writes that she cares for ▇▇▇ "as if he was her son" and that Londyn has said to him, "I have two mothers." Ex. M.

 Given the critical role that Ms. Hutsona plays in ▇▇▇ life, it goes without saying that her absence could have ruinous effects as ▇▇▇ navigates his pre-teen years. "[P]arental incarceration is now recognized as an 'adverse childhood experience' (ACE) of the type that can significantly increase the likelihood of long-term negative outcomes for children." The Osborne Association, *A Call to Action: Safeguarding New York's Children of Incarcerated Parents*, at 12

11

(May 2011); *see id.* ("[R]esearch suggests that parental imprisonment more often intensifies and compounds, rather than alleviates, the challenges children face."). Indeed, "[c]ompared to other children, those who experience parental incarceration suffer impairments across four domains of wellbeing: behavior, education, health, and hardship and deprivation." Kristin Turney and Rebecca Goodsell, *Parental Incarceration and Children's Wellbeing, The Future of Children*, Vol. 28, No. 1, Reducing Justice System Inequality, at 148 (Spring 2018). This factor alone warrants the Court's serious consideration.

Finally, the collateral consequences of Ms. Hutsona's prosecution have been unusually severe. Many criminal defendants endure negative press attention in the days or weeks following their arrest, but Ms. Hutsona has been hounded by the press nearly every day since her release on bail. The media is consumed by her case. Dozens of articles describing her as a "serial con artist" have appeared in newspapers and websites across the country. *See, e.g., Woman pleads guilty to stealing over $1M from Jason Kidd's ex Joumana*, NY Post (July 26, 2022); *How One Woman Stole Over $1 Million From an NBA Star's Ex-Wife,* Daquan (Oct. 20, 2021); *Tracii Hutsona: 'Serial Con Artist'*, NY Times (April 15, 2021); *She's not rich—but wanted to live that way*, NY Daily News (Feb. 19, 2021).

She has been repeatedly profiled on television where Joumana Kidd has described her as a psychopath. *See, e.g., How Tracii Hutsona Spent The Money She Stole,* American Greed (Jan. 25, 2023); *Owner of 'Breakfast Bitch' restaurant pleads guilty to federal fraud charge,* Channel 12 News (Sept. 6, 2022); *Actress Says YouTuber Scammed Her Out of Nearly $2 Million*, Inside Edition (May 11, 2021). And she has been the subject of multiple podcasts featuring Joumana Kidd enthusiastically describing the case and clearly enjoying the spotlight. *See, e.g., A Hollywood Con Woman, RHONJ, Madonna, and Leo,* Juicy Scoop with Heather McDonald

12

(Feb. 9, 2023); *Surviving Con Artists with Joumana Kidd,* Surviving the Survivor (April 7, 2022); *Joumana Kidd: Don't Get Scammed!,* Big Questions with Cal Fussman (April 24, 2022); *The Hot Girl Scammer with Naomi Ekperigin,* Scam Goddess (June 7, 2021).

The incessant press coverage—much of it highly sensationalized—has seriously impacted Ms. Hutsona's mental health as well as her business. Tabloid reporters call and email her daily. They follow her to and from her restaurant. They bother her staff. They even chased her and her counsel from the courthouse after she pled guilty in July 2022. Following her arrest, when a slew of articles appeared, her Phoenix food truck was evicted from its outdoor location, costing the restaurants thousands of dollars in weekly sales. Ex. A. Thereafter, the restaurants' POS company ceased processing their credits cards, and multiple food vendors pulled their accounts. *Id*. Since the American Greed story aired in January, the restaurants have received hundreds of negative reviews on Yelp, referencing the story and suggesting that people boycott both establishments. Someone also created an Instagram account, @breakfast_bitch story, that uses the Breakfast Bitch logo and seemingly exists solely to smear Ms. Hutsona and her business. To Ms. Hutsona's credit, she has managed to maintain her sanity and keep the restaurants afloat. However, because the coverage is available online, she may never escape the stigma of her offense.

While freedom of the press is critical to our democracy, there is only so much one person can take. The continuous onslaught of news coverage about Ms. Hutsona is punishment unto itself, and the substantial and ongoing impact it has had on her personal and professional life provides an important basis for leniency. *See United States v. Stewart,* 590 F.3d 93, 141 (2d Cir. 2009) (affirming trial court's decision to reduce sentence based on collateral consequences of conviction to defendant's career); *United States v. Nesbeth,* 188 F.Supp.3d 179, 194-95

(E.D.N.Y. 2016) (jail sentence unnecessary because defendant's inability to pursue teaching career constituted sufficient punishment); *see also United States v. Thavaraja,* 740 F.3d 253, 262-53 (2d Cir. 2014) (deportation deemed a permissible factor for consideration at sentencing).

## IV.

## PSR OBJECTIONS

¶ 29: Understandably, this paragraph includes Joumana's view of Ms. Hutsona's financial circumstances. That said, there is no evidence that Ms. Hutsona "continues to go on vacations, thro[w] lavish parties, and bu[y] expensive clothes." Accordingly, this phrase should be deleted.

¶ 30: Joumana's suggestion that Ms. Hutsona "might target the elderly next" is rank speculation and should be deleted.

## V.

## CONCLUSION

For the reasons stated above, Ms. Hutsona merits a significant variance from the advisory guidelines range.

Date:   New York, NY
        February 13, 2023