

*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*

February 21, 2023

**BY ECF**

The Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: *United States v. Tracii Show Hutsona*, 21 Cr. 299 (JMF)

Dear Judge Furman:

  The Government respectfully submits this letter in advance of the sentencing of Tracii Show Hutsona (the "defendant") on February 28, 2023. The defendant is a serial fraudster who stole the identity of the victim in this case and over $1 million of the victim's money. As set forth in the Presentence Investigation Report ("PSR"), and in the plea agreement, the Guidelines range is 33 to 41 months' imprisonment. The Probation Office recommends a sentence of 41 months' imprisonment, while the defendant requests a "significant variance." (*See* ECF No. 47 ("Def. Sub.") at 14). For the reasons set forth below, the Government agrees with the Probation Office that a sentence at the top end of the applicable Guidelines range would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

**A. Background**

  **1. The Offense Conduct**

  Between October 2015 and November 2019, the defendant engaged in a confidence scheme to embezzle over a million dollars from a victim (the "Victim"). (PSR ¶ 10). The Victim hired the defendant to serve as a personal assistant at the Victim's home and trusted the defendant with access to the Victim's financial information. (PSR ¶ 12). Just a few months after she was hired, and while the defendant was on supervised release in connection with a federal fraud conviction in California, the defendant began using that access to finance her own luxury lifestyle. (PSR ¶ 13). In February 2016, the defendant opened a credit card account in the Victim's name without the Victim's knowledge or authorization. (PSR ¶ 13). Nevertheless, later that year, she signed a motion requesting early termination of supervised release in the California case, citing, among other things, a false claim that she was not at that time involved in any ongoing criminal conduct. (PSR ¶ 14).

  In September 2018, the Victim's financial advisor alerted the Victim to significant expenditures from the Victim's financial accounts. (PSR ¶ 15). The Victim confronted the

defendant, who confessed that she had used the Victim's financial accounts for her own personal use and without authorization. (PSR ¶ 15). The defendant repeatedly apologized to the Victim, sending text messages stating, among other things, "I'm so distraught. I don't want to keep saying I'm sorry but I am so sorry." (PSR ¶ 15). Shortly thereafter, the defendant and the Victim signed an agreement, labeled the "Personal Plea Agreement," which stated, among other things, that the defendant had obtained an "additional user card in [the defendant's] name" (the "User Card") and that the defendant "had been using [the Victim's] account since July 2016." (PSR ¶ 16). The agreement further stated that the defendant needed to repay $307,498.02 to the Victim. (PSR ¶ 16). Having regained the Victim's trust, in the days and months after executing the Personal Plea Agreement, the defendant continued to use the Victim's financial accounts without permission, including through use of the User Card, which the defendant had represented to the Victim had been destroyed. (PSR ¶¶ 16-17).

In September 2019, the Victim terminated her relationship with the defendant after discovering additional unauthorized charges made by the defendant. (PSR ¶ 17). The Victim reported fraudulent expenditures on the Victim's financial accounts to her bank. (PSR ¶ 21). During the bank's subsequent investigation, the defendant faxed the bank a fraudulent "Power of Attorney" document (the "Power of Attorney"), which appeared to be signed by the Victim and notarized. (PSR ¶ 21). The Power of Attorney, which was dated February 15, 2017, stated that "effective immediately" the defendant would serve as the Victim's "attorney-in-fact" and have control over the Victim's "Banking and other financial institution transactions." (PSR ¶ 21). In fact, the Victim did not provide the defendant with any such power of attorney, the Victim did not sign the document, and the notary did not notarize it. (PSR ¶ 21).

During the scheme, the defendant, without authorization, added herself as an additional account holder to at least two checking accounts and a savings account maintained by the Victim, and obtained multiple credit cards in her own name but drawn on accounts of the Victim (collectively, the "Hutsona Fraud Accounts"). (PSR ¶ 18). For example, in July 2016, the defendant applied for a credit card in the defendant's name but linked to an account of the Victim. (PSR ¶ 18). The application included the Victim's social security number. (PSR ¶ 18).

Over the course of approximately four years, the defendant used the Hutsona Fraud Accounts to steal over $1 million from the Victim. (PSR ¶ 19). The defendant used the proceeds of her fraud scheme to make payments to the defendant's concierge business and for personal expenses, such as mobile phones, restaurants and nightclubs, luxury hotels, and jewelry. (PSR ¶ 19). To cover the purchases, the defendant transferred hundreds of thousands of dollars into the Hutsona Fraud Accounts from a checking account of the Victim and two 529 college savings accounts maintained by the Victim on behalf of the Victim's children. (PSR ¶ 20).

### 2. Procedural History

On February 17, 2021, the defendant was arrested in the District of Arizona and charged by complaint (the "Complaint") with wire fraud and aggravated identity theft, in violation of Title 18, United States Code, Sections 1343 and 1028A. (*See* ECF No. 1). On March 9, 2021, the defendant was presented telephonically before the Honorable Barbara C. Moses, United States Magistrate Judge. (ECF No. 4). On May 6, 2021, a grand jury sitting in this District returned an

indictment (the "Indictment") that charged the defendant with the same two counts set forth in the Complaint. (*See* ECF No. 9).

### 3. The Plea Agreement and the Stipulated Guidelines Range

On July 26, 2022, the defendant pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to Count One of the Indictment. In the Plea Agreement, the parties stipulated that the applicable sentencing range under the United States Sentencing Guidelines is 33 to 41 months' imprisonment (the "Stipulated Guidelines Range"). The PSR contains the same Guidelines calculation as that set forth in the Plea Agreement. (PSR ¶¶ 35-56, 117).

As part of her Plea Agreement, the defendant agreed to pay $1,148,759.28 in restitution. The defendant also consented to forfeiture of the same amount. A consent preliminary order of forfeiture signed by the parties is enclosed as Exhibit A. A proposed restitution order will be submitted by the Government in advance of sentencing.

### B. Discussion

#### 1. Applicable Law

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and

>    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  To the extent that a district court imposes a sentence outside the range recommended by the Guidelines, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50) (internal quotation marks omitted).

### 2. A Sentence at the High End of the Stipulated Guidelines Range Is Appropriate

The Government respectfully submits that a sentence at the high end of the Stipulated Guidelines Range of 33 to 41 months' imprisonment would be just.  In particular, such a sentence is justified by the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, provide adequate punishment, protect the public, and provide for deterrence.

*First*, the defendant's offense was extremely serious, as is reflected by the duration of the crime (approximately four years); the amount stolen (over $1 million), the means of the crime (identity theft, fraudulent documents, and misappropriation of, among other things, savings for the Victim's children's educations), and the fact that the defendant's criminal actions persisted even after the defendant was initially caught by the Victim and signed an agreement promising to make amends.  It was also serious because the defendant preyed upon the Victim at a time when the Victim was particularly vulnerable.  (*See* PSR ¶ 26).  Furthermore, the defendant's actions not only deprived the Victim of money, but also caused substantial damage to the Victim's credit; caused the Victim to spend many hours investigating and trying to recover from the crime; and resulted in substantial emotional distress to the Victim, which has had lasting and significant consequences.  (*See* PSR ¶¶ 26-27, 30).

*Second*, the sentence requested herein is necessary to reflect the history and characteristics of the defendant, protect the public, provide adequate punishment, promote respect for the law, and adequately provide for specific deterrence.  The defendant is a serial identity thief and fraudster, with a criminal history dating back almost 30 years and involving multi-year periods of incarceration and repeated violations while under court supervision.  (*See* PSR ¶¶ 47-53).  Her past state convictions involved, among other things, (i) theft of personal property (PSR ¶ 47); (ii) using a bad check to purchase a car (PSR ¶ 48); (iii) forging the signature of a victim (PSR ¶ 49); (iv) repeated use of forged checks to defraud a financial institution (PSR ¶ 50); and (v) using a victim's name and social security number to open a department store credit card (PSR ¶ 51).  More recently, in 2009, the defendant was sentenced to 75 months' imprisonment after pleading guilty to wire fraud, aggravated identity theft, and attempted tax evasion in a case in the Central District of California—the defendant committed the instant offense while still on supervised release for this California case.  (PSR ¶ 53).  It is evident that numerous past convictions and periods of incarceration have been unable to deter the defendant.

Furthermore, the defendant's crime was not one of need or an act of desperation—indeed, according to the defendant, while she was committing the instant offense, she was earning $80,000 per year from her concierge company. (PSR ¶ 98). Instead, the defendant's motivation was the same as her motivation in committing the crimes that resulted in her last federal conviction—her greed and desire to live a luxury lifestyle. (*See* PSR p. 36 ("We have found no reason as to why Hutsona stole this exorbitant amount of money, except for greed."); *United States v. Tracii Lynne Show Vician*, 08 Cr. 58, Sentencing Transcript dated June 22, 2009, attached as Exhibit B, at 24-25 ("I agree with the government that the offense was not committed out of financial need but rather a desire to maintain a high-end lifestyle.")). Moreover, the defendant has prioritized continuing to live such a lifestyle over paying back her numerous victims. According to the United States Attorney's Office for the Central District of California, the defendant still owes $458,902.41 of the $484,439.79 ordered in restitution in the California federal case. Since her arrest in this case, the defendant has vacationed in Puerto Rico—a trip taken in violation of her bail conditions—and, despite anticipated seven-figure forfeiture and restitution orders, continued to live in luxury, residing in a four-bedroom, three-bath home with an estimated value of over $1.7 million. (PSR ¶ 74).[1] In sum, the defendant's conduct before, during, and after her commission of the instant offense reflects the need for the sentence handed down to protect the public, provide adequate punishment, promote respect for the law, and adequately deter the defendant.

*Third*, a significant sentence in this case is important to help dissuade others from committing similar crimes. The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white-collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is an important sentencing factor in fraud and white-collar cases because it is seen as effective. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (quotation marks and citation omitted). A sentence at the high end of the Stipulated Guidelines Range will signal to others who consider engaging in identity theft and fraud that their conduct will be met with serious punishment.

In light of the above, the defendant's arguments for a "significant variance" should be rejected. The defendant's claim that, during 2019 and 2020, the defendant turned her life around "entirely on her own initiative," (Def. Sub. at 2), ignores that she formed her restaurant business along with her husband while she was actively stealing from the Victim, using at least one of the Hutsona Fraud Accounts to pay expenses for that business. Furthermore, in emphasizing the risk to that business and its employees of her incarceration, (Def. Sub. at 10), the defendant downplays the fact that her husband, who holds an engineering degree, is a co-founder of the business, and

---

[1]   See   https://www.zillow.com/homedetails/10172-E-Cochise-Dr-Scottsdale-AZ-85258/8060255_zpid/   (last   visited   February   17,   2023); https://www.redfin.com/AZ/Scottsdale/10172-E-Cochise-Dr-85258/home/27693237 (last visited February 17, 2023).

Case 1:21-cr-00299-JMF   Document 49   Filed 02/21/23   Page 6 of 8

Page 6 of 8

appears to have no other employment, appears available to continue its operations, a factor that distinguishes this case from those she cites as authority.[2]

Moreover, while laudable, the defendant's charitable activities—consisting of collecting Christmas gifts for needy children at her restaurant, volunteering at several food drives, and opening her kitchen to a local chef (Def. Sub. at 8-9)—are unexceptional and insufficient to warrant a below Guidelines sentence. *See* U.S.S.G. § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (noting that "[i]n extraordinary cases . . . a district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the heartland cases covered by the guidelines'" (quoting U.S.S.G. § 5K2.0 cmt.)).[3]

While the defendant's incarceration will certainly interfere with her relationship with her stepson, (Def. Sub. at 11-12), he will continue to have the support of his father and mother. Accordingly, the defendant's family is not likely to face extraordinary hardship, when compared to the families of other criminal defendants, as a result of her incarceration. *See United States v. Cutler*, 520 F.3d 136, 165 (2d Cir. 2008) ("[The defendant's] wife and children will no doubt face hardship, but this is true whenever family members are deprived of the company and/or support of a defendant who is incarcerated."); *United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003) ("It is not unusual . . . for a convicted defendant's incarceration to cause some hardship in the family.").

---

[2] *See United States v. Milikowsky*, 65 F.3d 4, 8-9 (2d Cir. 1995) (affirming nonincarceratory sentence for defendant with Guidelines range of 8 to 14 months' incarceration in light of extraordinary impact that loss of his daily involvement in business would have on his business, which was in an "extremely precarious financial condition"); *United States v. Gorodetsky*, 288 F.R.D. 248, 250 (E.D.N.Y. 2013) (sequencing sentences of co-defendant business partners so that one defendant could continue the business while the other defendant was in custody); *United States v. Khalid*, No. 09-CR-734, 2011 WL 6967993, at *2 (E.D.N.Y. Dec. 13, 2011) (imposing probationary sentence on defendant who had led law-abiding and responsible life, owned several businesses, employed over a dozen people, and supported elderly parents, a wife, and five children); *United States v. Romano*, No. 08-CR-76, 2008 WL 4427759, at *1 (E.D.N.Y. Sept. 16, 2008) (imposing probationary sentence on defendant with Guidelines range of 0 to 6 months' incarceration who owned a small commercial trucking business that employed four individuals whose jobs would be at risk if he were incarcerated); United States v. DiMattina, 885 F. Supp. 2d 572, 589 (E.D.N.Y. 2012) (granting release pending appeal to defendant with "sole responsibility" for business).

[3] In *Rioux*, the Second Circuit concluded that the district court did not abuse its discretion when it concluded that the combination of the defendant's serious physical impairment, consisting of kidney disease and bone disease, and his charitable acts warranted a departure. *Id.* This case offers no such compelling basis for a variance. *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) (charitable contributions "must be exceptional before they will support a more-lenient sentence").

Furthermore, to the extent the defendant contends that the press attention caused by her criminal actions warrants a lighter sentence, (Def. Sub. at 12-14), the Second Circuit has rejected this reasoning. In *United States v. Cutler*, 520 F.3d 136 (2d Cir. 2008), the district court

> ruled that although the seriousness of [defendant's] offense would ordinarily warrant a prison term, [defendant] had already received 'just punishment for the offense' because of 'the public nature of the prosecution, the public humiliation that the defendant has suffered, the loss of his law license and various other consequences, and the certainty of prosecution.' The court also found that these factors were sufficient to accomplish 'deterrence in the general sense.'

520 F.3d at 170 (citations to sentencing transcript omitted). The Second Circuit's response was blunt: "As a matter of law and reason, we cannot agree." *Id.* The Circuit then noted in *Cutler* that "the consequences listed by the court are hardly unusual. An attorney convicted of a felony usually loses his license to practice law. The imposition of a light sentence on this basis is not within the court's discretion." *Id.* (citing *Koon v. United States*, 518 U.S. 81, 110 (1996)). The Circuit also wrote:

> Nor is it unusual for a person convicted of participating in a conspiracy to perpetrate massive frauds to be publicly prosecuted and suffer public humiliation. Those are consequences generally suffered by anyone accused and convicted of a crime, especially a crime involving frauds causing losses of more than $100 million. Thus, the imposition of a nonincarceratory sentence on the basis that a defendant has suffered sufficiently simply because he was prosecuted and convicted would create unwarranted disparities among similarly situated defendants.
>
> Finally, the circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that [defendant's] public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed 'punishment' it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*Id.* at 171.[4]  The Government does not question that this prosecution has had and will continue to have lasting consequences for the defendant.  Simply stated, these consequences do not warrant the "significant variance" she now seeks.

**C.  Conclusion**

For years, the defendant preyed upon a vulnerable victim, stole that victim's identity and money set aside by that victim for the education of her children, and used the proceeds of her crime to lead a luxury lifestyle while shirking her responsibility to pay back her prior victims.  For all the foregoing reasons, the Government respectfully submits that the defendant's conduct warrants a sentence at the high end of the Stipulated Guidelines Range of 33 to 41 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/
Timothy V. Capozzi
Assistant United States Attorney
(212) 637-2404

cc:  Deborah Colson, Esq.

---

[4] After it decided *Cutler*, the Second Circuit held that when reviewing what is sufficient to meet the Section 3553(a) considerations in any particular case "we will not substitute our own judgment . . . [w]e will instead set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (citation and internal quotations marks omitted).  The *Cavera* court then wrote:  "To the extent that our prior cases may be read to imply a more searching form of substantive review, we today depart from that understanding," and cited *Cutler* at pages 164 and 167.  *Id.* (footnote omitted).  The Circuit has not, to the Government's knowledge, questioned the logic of the portions of *Cutler* quoted above.