

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 13, 2023

**BY EMAIL *EX PARTE* AND REQUEST TO BE FILED UNDER SEAL**

The Honorable Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

  Re:  ***United States v. Tracii Show Hutsona*, 21 Cr. 299 (JMF)**

Dear Judge Furman:

  The Government respectfully submits this letter *ex parte* to notify the Court of the defendant's apparent violations of conditions of her release after her recent sentencing and, based on those violations, request that the Court schedule a prompt hearing and at that hearing remand the defendant to begin serving her sentence. As detailed below and in the enclosed materials from the victim's counsel, since her sentencing on February 28, 2023, the defendant has publicly posted messages on the Internet that are intended to harass the victim and include financial account information of the victim and the victim's family members. For reasons discussed below, the Government respectfully requests that this letter remain *ex parte* until the defendant appears in person at a hearing to address the issues raised herein.

**A.  Background**

  As the Court is aware, between October 2015 and November 2019, the defendant engaged in a confidence scheme to embezzle over a million dollars from a victim (the "Victim"). The Victim hired the defendant to serve as a personal assistant at the Victim's home and trusted the defendant with access to the Victim's financial information. Just a few months after she was hired, and while the defendant was on supervised release in connection with a federal fraud conviction, the defendant began using that access to finance her own luxury lifestyle.

  On July 26, 2022, the defendant pleaded guilty to Count One of the Indictment, which charged her with wire fraud, in violation of Title 18, United States Code, Section 1343. On February 28, 2023, the Court sentenced the defendant to a term of incarceration of 51 months and set a surrender date of April 13, 2023. At the conclusion of the sentencing hearing, the Court admonished the defendant:

    the conditions of your release until now will continue to apply until you surrender for your sentence. You should understand that if you violate any of these conditions, it could have an immediate effect on your release, which is to say you

could be remanded immediately . . . So that means that you, for the next six weeks, better observe every I, T, every line of your release conditions and ensure that you don't commit any violations, small, large, medium.

Sent. Tr., enclosed as Exhibit A, at 46. The judgment of conviction of was filed on March 1, 2023. The defendant filed a notice of appeal on March 2, 2023.

## B.     New Information

As detailed in the letter and support materials from the Victim's counsel, enclosed as Exhibit B, since her sentencing less than two weeks ago, the defendant has repeatedly violated conditions of her release by posting publicly available messages on the Internet that are intended to harass the victim and include financial account information of the victim and the victim's family members. The messages include Instagram posts on March 4, 2023, which include a screenshot of text messages that list account numbers for two of the Victim's children's 529 accounts (*see* Ex. B at Ex. 1(a)), and on March 9, 2023, which include an image of a purported power of attorney document listing the bank account number for an account of the Victim (*see* Ex. B at Ex. 5).

## C.     Applicable Law

A defendant who has pleaded guilty to an offense and who is awaiting execution of sentence "shall . . . be detained" unless the Court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(a)(1). Section 3143(b)(1) similarly authorizes bail pending appeal only when a judicial officer finds, among other things, "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released."[1]

A defendant who violates a condition of release "is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a).

---

[1] Even after a notice of appeal has been filed, the initial determination of whether to grant bail pending appeal generally is to be made by the District Court. Fed.R.App.P. 9(b), advisory committee note to 1967 adoption. "[G]iven the findings that must be made in order to warrant release, it is generally more appropriate that the motion be made initially in the district court. . . . When release is sought before the appeal has been briefed and argued, the district court, having greater familiarity with the record, is normally in a far better position than the court of appeals to make [the] determinations [called for by 18 U.S.C. § 3143(b)(1)] in the first instance." *United States v. Hochevar*, 214 F.3d 342, 344 (2d Cir. 2000). The burden of establishing that a defendant meets these criteria and is entitled to release falls on the defendant. *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) ("We note that on this issue, as on all the criteria set out in subsection (b), the burden of persuasion rests on the defendant.") (citation omitted); *see United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004) ("the Bail Reform Act of 1984, creates no general expectation of post-verdict liberty. To the contrary, it establishes a presumption in favor of detention.") (citing18 U.S.C. § 3143(a), other citation omitted).

**D.     Discussion**

Based on the new information discussed in the letter from Victim's counsel, the defendant should be detained.  Indeed, detention is warranted under both Section 3143, which addresses release pending execution of sentence and appeal, and Section 3148, which addresses violations of conditions of release generally.

Because the defendant has been convicted and sentenced, she must be detained unless she shows "by clear and convincing evidence" that she neither poses a flight risk nor poses a danger to the safety of any person or the community.  She cannot satisfy that burden.

The defendant plainly presents a danger to the community, and specifically to the victim and her family.  As is clear from the materials appended to the letter from Victim's counsel, since her sentencing, the defendant has repeatedly and publicly harassed the victim by posting messages, some of which contain personal financial information of the victim and the victim's family members.  One of the messages prompted another person to write about the Victim: "She's a fame seeker!!!!  Hope she's prepared for what's coming!"  Given the defendant's lengthy history of disregard for the rule of law, her previous pre-sentencing violations of her conditions of release in this case, and the Court's recent admonition to abide by her conditions, she cannot show by clear and convincing evidence that any conditions of release would protect the Victim and her family from danger.

The defendant also presents a flight risk.  While she voluntarily appeared for prior proceedings in this case, including sentencing, her post-sentencing conduct reflects contempt for the rule of law and for this Court's authority.  She cannot be trusted to obey the legal requirement that she surrender to serve her sentence.  At a minimum, the defendant cannot present clear and convincing evidence that she will not flee, as required to justify her continued released on conditions.

Detention is also required under Section 3148 for similar reasons.  One condition of the defendant's bail is that she not possess any personally identifying information of others except immediate family members.  Another prohibits her from contact, direct or indirect, with the Victim.  Her recent postings constitute "clear and convincing evidence" that the defendant has repeatedly violated these conditions.  *See* 18 U.S.C. § 3148(b)(1)(B).  The defendant's history and conduct in this case make it exceedingly unlikely that she would "abide by any condition or combination of conditions of release."  18 U.S.C. § 3148(b)(2)(B).  Therefore, she must be detained.  *See* 18 U.S.C. § 3148(b).

   Given the risks of danger and flight that the defendant poses, the Government respectfully requests that this letter remain sealed and *ex parte* to avoid giving the defendant an opportunity to further retaliate against the Victim and/or to flee.  We propose that this letter not be disclosed to the defense until the defendant, who resides in Arizona, appears in Your Honor's courtroom in person.  The Government would provide the letter to defense counsel at that time, and would later file the letter on the public docket.

       Respectfully submitted,

       DAMIAN WILLIAMS
       United States Attorney

By:

         /s/
       Timothy V. Capozzi
       Assistant United States Attorney
       (212) 637-2404

N2SChutS

# EXHIBIT A

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        21 Cr. 299 (JMF)

5    TRACII SHOW HUTSONA,

6              Defendant.

7    ------------------------------x

8                                   New York, N.Y.
                                    February 28, 2023
9                                   2:15 p.m.

10
     Before:
11
                    HON. JESSE M. FURMAN,
12
                                        District Judge
13
                         APPEARANCES
14
     DAMIAN WILLIAMS,
15        United States Attorney for the
          Southern District of New York
16   BY:  TIMOTHY CAPOZZI
          Assistant United States Attorney
17
     DEBORAH A. COLSON
18        Attorney for Defendant

19   QUINN EMANUEL URQUHART & SULLIVAN LLP
          Attorneys for Joumana Kidd
20   BY:  MICHAEL LINNEMAN

21   ALSO PRESENT:  Detective Daniel Alessandrino

22

23

24

25
```

N2SChutS

1          (Case called)

2          MR. CAPOZZI:  Good afternoon, your Honor.  Timothy

3    Capozzi for the United States.  With me at counsel table is

4    Detective Daniel Alessandrino.

5          THE COURT:  Good afternoon.

6          MS. COLSON:  Good afternoon, your Honor.  Deborah

7    Colson for Ms. Hutsona.

8          THE COURT:  Good afternoon to the two of you.

9          Mr. Capozzi, do you know if counsel for the victim or

10   the victim are here today?

11         MR. CAPOZZI:  They are, your Honor.

12         THE COURT:  Both?

13         MR. CAPOZZI:  Both.

14         THE COURT:  We're here for purposes of sentencing.  In

15   preparation for today's proceeding, I have reviewed the

16   presentence report, dated October 17th, 2022.  I've also

17   received and reviewed the following additional submissions: the

18   defendant's submission, dated February 13th, 2023, as well as

19   the attachments to that submission, namely 15 letters addressed

20   to me from the defendant, from her husband, her daughter, other

21   members of her family, some friends, employees and the like, as

22   well as the government's submission, dated February 21, 2023,

23   as well as the attachments to that submission, namely a

24   proposed forfeiture order and the sentencing transcript from

25   defendant's 2009 sentencing.  I've also received and hope

N2SChutS

```
1   counsel have, a letter from the U.S. Attorney's Office, dated
2   February 24th, 2023, which encloses or attaches letters from
3   three people, Ms. Heart, from Ms. Hutsona's ex-husband, and
4   from counsel to the victim in this matter, the last of which
5   include 20-some-odd exhibits, pictures, and videos from social
6   media.  I also received a proposed restitution order.
7          First, have each of the parties received all of the
8   foregoing submissions, including with respect to any that are
9   in redacted form, in unredacted form.
10          Mr. Capozzi.
11          MR. CAPOZZI:  Yes, your Honor.
12          THE COURT:  Ms. Colson.
13          MS. COLSON:  I have.  Thank you.
14          THE COURT:  Are there any additional submissions that
15   I should have received?
16          MR. CAPOZZI:  No, your Honor.
17          MS. COLSON:  None from us.  Thank you.
18          THE COURT:  The defense submission was filed with
19   certain minimal redactions, namely, if not entirely, the names
20   of minors and a few third parties.  I have reviewed those.  I
21   find that they are well justified and narrowly tailored, so I
22   will approve them and file the unredacted copy of the defense
23   submission under seal.  It will be available to counsel in the
24   event of an appeal without further application to me.
25          My practice, in general view, is that the three, we'll
```

N2SChutS

1    call them victim letters, although really only one of them is

2    that, that they should be filed publicly, perhaps with the

3    names and other identifying information redacted.  But

4    particularly with respect to the victim letter here, it makes a

5    variety of arguments, including objections to the sentencing

6    guidelines calculation, that we will discuss shortly, that I

7    think should be part of the public record.

8           Any objection from you, Mr. Capozzi, to those things

9    being filed, perhaps with redactions?

10          MR. CAPOZZI:  No objection.  I would propose that I

11   confer with counsel for the victim on the proposed redactions

12   that the government would make and then file on the public

13   docket.

14          THE COURT:  Ms. Colson, any objection?

15          MS. COLSON:  No objection, your Honor.

16          THE COURT:  Why don't you do that, why don't you

17   confer with Ms. Colson as well as the writers of the letters,

18   including counsel, with respect to any proposed redactions.

19   Today is Tuesday, why don't you plan to file those with

20   redactions by Friday.  I will compare them with the versions

21   that I have, which is to say I'll review the redactions.  If I

22   find they are problematic, I will issue an order appropriately.

23   If they are okay with me, which is to say narrowly tailored to

24   any reasons that would justify sealing or redaction, I will

25   leave them be.  Those unredacted letters will also be filed

N2SChutS

1    under seal and also available to counsel in the event of an

2    appeal without further application to me.

3              Ms. Colson, have you read the presentence report?

4              MS. COLSON:  I have.

5              THE COURT:  Have you reviewed it with Ms. Hutsona?

6              MS. COLSON:  I have.

7              THE COURT:  Now, I note you made two objections in

8    your written submission to paragraphs 29 and 30.  Aside from

9    those, any objections or corrections to the report?

10             MS. COLSON:  No.  Thank you.

11             THE COURT:  Ms. Hutsona, have you read the presentence

12   report?

13             THE DEFENDANT:  I have, your Honor.

14             THE COURT:  Did you review it with Ms. Colson?

15             THE DEFENDANT:  Yes, I have.

16             THE COURT:  And did you have enough time to do that,

17   to go over the report with her and to discuss anything that you

18   would wish to bring to my attention in connection with

19   sentencing?

20             THE DEFENDANT:  Yes, I have, your Honor.

21             THE COURT:  Mr. Capozzi, have you reviewed the

22   presentence report?

23             MR. CAPOZZI:  Yes, your Honor.

24             THE COURT:  Putting aside the guidelines, any

25   objections or corrections?

N2SChutS

1          MR. CAPOZZI:  No, your Honor.

2          THE COURT:  With respect to the defense objections to

3    paragraphs 29 and 30, I will overrule the objection to

4    paragraph 29.  Given the exhibits to the victim's counsel's

5    letter that I have reviewed, I think there is a basis for that

6    statement and therefore will not strike that language from the

7    report.

8          As to paragraph 30, I certainly agree that that

9    statement is rank speculation and in that regard, I don't plan

10   to give it any weight or don't give it any weight except as to

11   treat it as a statement from the victim of her view that the

12   defendant is someone who preys on and is likely to prey on

13   vulnerable victims in the future.  So construed, I don't see

14   any reason why that sentence needs to be deleted, but to the

15   extent that it is rank speculation, I won't put any weight on

16   it.

17         Now, given those rulings, given the absence of any

18   objections, I will adopt the factual recitations set fort in

19   the presentence report which will be made part of the record in

20   this matter and kept under seal.  In the event of an appeal,

21   counsel on appeal may also have access to the sealed report

22   without further application to me.

23         Turning then to the guidelines, as counsel know, I'm

24   not bound by the guidelines, but I do have to consider the

25   guidelines before imposing sentence.  In this case, there was a

N2SChutS

1   plea agreement in which the parties stipulated to a particular

2   calculation of the sentencing guidelines.  Am I correct that

3   the presentence report's calculation is consistent with the

4   parties' calculation?

5              Mr. Capozzi.

6              MR. CAPOZZI:  Yes, your Honor.

7              THE COURT:  Ms. Colson.

8              MS. COLSON:  Yes.

9              THE COURT:  Having said that, as I noted a moment ago,

10  counsel for the victim has raised a handful of objections to

11  the guidelines calculation that I want to give you a chance to

12  address.  So why don't we go through those in turn.  I think

13  there are five, only some of which I think I need you to

14  address.

15             First, is that the loss enhancement should be 16

16  levels, not 14 levels because the loss exceeded $1.5 million.

17  Mr. Capozzi, I certainly understand that you stand by the plea

18  agreement, but pursuant to the terms of the agreement, you're

19  allowed to respond to queries from the Court regarding

20  guidelines calculations.  So I would ask for your views on that

21  issue first.

22             MR. CAPOZZI:  Your Honor, as to the loss amount, which

23  also ties to the restitution amount, the exact figure of loss

24  here is difficult to measure with exact precision for several

25  reasons: the duration of the scheme, the number of financial

N2SChutS

1    accounts that the defendant used to pursue her fraud, the money

2    transfers across accounts as well as the challenge of

3    disentangling fraudulent uses versus potentially legitimate

4    uses.  It was particularly challenging here where the defendant

5    was employed as a personal assistant for the victim during that

6    period of time.

7         We stand by our figure in the plea agreement, as

8    you've alluded to.  That figure is based on the unauthorized

9    charges to the credit cards in this case, which we believe to

10   be readily provable, as well as a reasonable estimate of the

11   loss that avoided potential double counting because, in this

12   instance, in some cases, funds were moved from an account to

13   pay off the credit cards.  That's the basis for where we came

14   up with the figure and we continue to believe that it's an

15   appropriate and reasonable estimate for the Court to adopt in

16   fashioning its own view of the guidelines.

17        THE COURT:  And I assume you looked at the chart in

18   counsel for the victim's letter, pages 5 and 6, totals in

19   excess of $1.5 million in alleged losses.  Is there anything on

20   that chart that you think qualifies as double counting or is

21   improperly included?

22        MR. CAPOZZI:  Your Honor, I don't know that any of

23   that necessarily, I can say for certain, qualifies as double

24   counting.  I would simply say that based on our understanding,

25   we are quite confident that the figure that we've put forward

N2SChutS

1    does not include any double counting and that's reason why

2    we've gone with what we have.  Again, I'm not saying that they

3    are double counting.  I just know that we believe ours is

4    readily proveable and reasonable in the calculation.

5         THE COURT:  Ms. Colson, I don't know if you wish to be

6    heard on this.  Let me perhaps preempt that by saying that I

7    will stick with the 14-level enhancement given the government's

8    position.  I take that to mean that the government is not

9    prepared to prove up, if the matter were disputed, as I suspect

10   it might be, that proper loss figure exceeds $1.5 million, and

11   for that reason, I think that the 14-level enhancement is

12   appropriate.

13        Given that, I assume you don't need to be heard on it?

14        MS. COLSON:  I don't.  Thank you.

15        THE COURT:  The second matter is whether a two-level

16   enhancement pursuant to section 2B1.1(b)(10)(C) is appropriate

17   because "the offense otherwise involves sophisticated means and

18   the defendant intentionally engaged in or caused the conduct

19   constituting sophisticated means."

20        Mr. Capozzi.

21        MR. CAPOZZI:  Your Honor, again, we stand by our

22   submission in the plea agreement.  I think this guideline in

23   particular is one that reasonable minds can differ when it

24   would and would not apply.  We've described the offense

25   conduct.  We think that it was longstanding and creative in

N2SChutS

1    certain ways, but generally speaking, not particularly

2    complicated and thus have not applied the sophisticated means

3    enhancement.

4              THE COURT:  Ms. Colson, do you wish to be heard on

5    that?

6              MS. COLSON:  No, I agree with the government, your

7    Honor, that while this was longstanding conduct, there was

8    nothing about what Ms. Hutsona did that was particularly

9    sophisticated.

10             THE COURT:  I think it's a close call, and as

11   Mr. Capozzi puts it, reasonable minds can certainly disagree,

12   but if the tie to the runner, the runner here being the

13   parties' agreement, in that sense, will not apply that

14   enhancement.

15             Now, third is a two-level enhancement pursuant to

16   subsection (11)(C)(i) because the offense involved, "the

17   unauthorized transfer or use of any means of identification

18   unlawfully to produce or obtain any other means of

19   identification."  Now, this one seems like there might be a

20   stronger case for it to apply given the application notes,

21   which seem to squarely fit the facts of this case, but

22   Mr. Capozzi, your thoughts on that.

23             MR. CAPOZZI:  Your Honor, I think at the time of the

24   plea agreement, which we stand by, we viewed this enhancement

25   as primarily concerned with the creation of identity documents

N2SChutS

1    and that differing from this case where the crime was primarily

2    focused on using fraudulent accounts to make fraudulent

3    charges, but I think of all of the issues raised by the

4    victim's letter, I think this is closer than the others, and I

5    concede that the application note --

6          THE COURT:  I mean, the two examples seem fairly

7    dead-on to this case; am I wrong?

8          MR. CAPOZZI:  We stand by the plea agreement, but I

9    agree that application note examples are quite similar in fact.

10         THE COURT:  Ms. Colson.

11         MS. COLSON:  Your Honor, I would just point out that

12   of course the plea agreement was carefully negotiated with the

13   government and I do agree that the gravamen of Ms. Hutsona's

14   offense here was the use of fraudulent accounts.

15         THE COURT:  But am I wrong that she used the victim's

16   name to obtain credit cards that have the victim's name and/or

17   social security number that she then used?

18         MS. COLSON:  No, you are not wrong about that.

19         THE COURT:  So I think given that, and the comments,

20   the application notes, this enhancement squarely does apply,

21   notwithstanding the negotiated nature of the plea agreement,

22   I'm not bound by it, as Ms. Hutsona confirmed she understood at

23   the time of the plea agreement.  So I will apply that two-level

24   enhancement.

25         Next is whether a two-level enhancement should be

N2SChutS

applied under subsection (17)(A) because Ms. Hutsona "derived

more than $1 million in gross receipts from one or more

financial institutions as a result of the offense."  Here, too,

given the facts, namely in excess of $1 million was charged to

the credit card accounts, it seems like that would apply.

          But, Mr. Capozzi, your thoughts.

          MR. CAPOZZI:  Your Honor, my understanding of that

enhancement is that it's primarily focused on conduct that

places a financial institution at risk, theft from a financial

institution, as opposed to here where it was theft from a

victim who clearly had accounts at financial institutions, but

the theft itself was not directed necessarily at the financial

institutions, it was directed at someone who had accounts at

financial institutions.  So I think that's our understanding of

that enhancement and that's why we did not include it.

          THE COURT:  There's nothing in the language of the

enhancement that discusses a financial institution being placed

in jeopardy.  I guess the question is, does it have to be the

bank or the financial institution's money as opposed the money

held by a bank or credit card company in the name of someone

else.

          MR. CAPOZZI:  Your Honor, the case that I looked at

was *United States v. Huggins*, 844 F.3d 118, 123-24

(2d Cir. 2016).  That's where I saw language as to the primary

purpose of the enhancement, i.e., to penalize an individual for

N2SChutS

1    placing a financial institution at risk by borrowing or

2    stealing funds to support criminal activity.

3            THE COURT:  I'll take a look as we discuss.

4            Ms. Colson.

5            MS. COLSON:  I don't have anything to add to that,

6    your Honor.

7            THE COURT:  Having read *Huggins*, I agree with the

8    government that the enhancement does not apply.  Here as there,

9    financial institution acted as a little more than a conduit of

10   funds as opposed to being a victim of lost funds as a result of

11   the fraud.  The Court notes that the circuit's precedence

12   focused on whether the financial institution suffers some type

13   of loss or liability in providing the requisite funds.  Indeed,

14   no case in this circuit has applied this enhancement where a

15   financial institution did not suffer some type of loss or

16   liability.  So given that, I will not apply that enhancement.

17           Any final objection raised by counsel for the victim

18   is that Ms. Hutsona should not receive a two-level reduction

19   for acceptance of responsibility pursuant to section 3E1.1.

20   Although, I certainly think her failure to pay restitution in

21   this case and the prior case is relevant under Section 3553.  I

22   don't think it undercuts that she has fundamentally accepted

23   responsibility by pleading guilty in a timely manner.  So I

24   disagree with that objection and will grant the reduction for

25   acceptance of responsibility.

N2SChutS

1          So, in light of the foregoing, in light of the

2     parties' agreement, the absence of any objections, and my

3     independent evaluation of the guidelines, I find, using the

4     November 2021 edition of the guidelines, that the offense level

5     is 20, the criminal history category is III, and the

6     corresponding guidelines range is 41 to 51 months'

7     imprisonment, with a fine range of $15,000 to $150,000, and a

8     supervised release range of 1 to 3 years.

9          In the plea agreement, both parties agreed not to seek

10     a departure from the stipulated sentencing guidelines range,

11     which is different from the range that I just calculated.

12          Having said that, does either party believe that a

13     downward departure within the meaning of the guidelines and as

14     distinct from what has become to be known as a variance is

15     appropriate here?

16          Mr. Capozzi.

17          MR. CAPOZZI:  No, your Honor.

18          THE COURT:  Ms. Colson.

19          MS. COLSON:  No, your Honor.

20          THE COURT:  I've nevertheless considered whether there

21     is any appropriate basis for a departure and find there are no

22     grounds to justify a departure.

23          With that, I will hear first from counsel.  If the

24     victim or counsel for the victim wish to be heard, I will give

25     them an opportunity to be heard, as well, and then hear from

N2SChutS

1   the defendant if she wishes to make a statement before I

2   sentence her.

3           I'll start with the government.  Mr. Capozzi.

4           MR. CAPOZZI:  Thank you, your Honor.  Your Honor has

5   received and reviewed our submission, so I will not go over all

6   of the points made in it.

7           Your Honor, obviously, this was a serious crime, it

8   was sustained, it was substantial in financial terms.  The

9   victim has written about the emotional toll that she suffered

10  as a result of this conduct.  Your Honor, what I think is

11  fairly extraordinary and remarkable is that this conduct

12  followed from not just the federal conviction in California

13  from 2008 or 2009, but the series of earlier convictions in

14  state court in California.

15          In this instant offense, the defendant began stealing

16  while she was on supervised release.  So after serving a large

17  portion of a 75-month federal sentence, she's on supervised

18  release and she begins stealing and committing fraud again.

19  She is caught by the victim midway through and pleads with the

20  victim in terms of apologizing and so forth.  Even though

21  caught at that point, she nevertheless continues to steal from

22  the victim.  Then when the victim catches her yet again and

23  finally ends the relationship, she submits a fraudulent power

24  of attorney document, essentially an effort to cover her

25  tracks.

N2SChutS

1          So this defendant has shown an unwillingness or an

2    inability to stop her fraudulent ways, committing identity

3    theft, stealing from victim, after victim, after victim, and

4    seems unable to be deterred thus far.  That counsels in favor

5    of a serious sentence here, counsels in favor for a need to

6    protect the public, counsels in favor of a need to hand down a

7    sentence that will send a message to this defendant as well as

8    to other defendants that that type of disregard for the rule of

9    law will not be countenanced.

10          Your Honor, the defendant's conduct since this case

11   suggests that there's a question about the degree of remorse

12   and the degree to which it's being taken seriously, which I

13   think is also a concerning factor here and one that the Court

14   should consider when fashioning an appropriate sentence.

15          THE COURT:  Are you referring to the social media

16   materials that the victim's counsel submitted?

17          MR. CAPOZZI:  Yes, your Honor, the social media

18   postings as well as just the fact of the travel to Puerto Rico

19   without permission prior from pretrial I think is concerning.

20          THE COURT:  Do you have a view on whether, on the

21   basis of those social media postings, it could be said that

22   Ms. Hutsona not just wasn't taking things seriously, but was

23   not in compliance with the terms of her release.  One video

24   seems to depict her smoking marijuana on a beach in Puerto

25   Rico, others seem to depict her in California not for purposes

N2SChutS

1    of work.  Counsel certainly takes the position that those were

2    violations of the terms of her release.

3         MR. CAPOZZI:  The Puerto Rico trip is clearly and was

4    a violation.  The image appears to be someone smoking

5    marijuana, which would be a violation.  The trips to

6    California --

7         THE COURT:  Not someone, the defendant?

8         MR. CAPOZZI:  The defendant.  The defendant smoking

9    marijuana.

10        The images from the trips to California, whether or

11   not there was other activity that was undertaken during those

12   trips, I don't know, but I certainly would say that those

13   images do not depict someone at work in California at the time

14   of those images.

15        And so, I think when you add to that the fact of a

16   victim from a prior case being owed well over $400,000, still

17   this victim suffering in excess of $1 million in loss, it

18   suggests, again, a lack of remorse, a lack of taking it

19   seriously, and apparently someone who needs this Court to send

20   her a message.

21        THE COURT:  Can you speak to restitution.  I know you

22   alluded to it earlier, but counsel for the victim contends that

23   restitution should be in the nature of $1.7 million, not the

24   amount that you have sought.

25        MR. CAPOZZI:  Your Honor, the restitution amount that

N2SChutS

1   we have included in our plea agreement is tied to the loss

2   amount that we've calculated.  We've been in continuing

3   dialogue with counsel for the victim.  We don't understand the

4   victim to be seeking an evidentiary hearing, if the Court is

5   inclined to adopt the proposed restitution amount in the

6   proposed restitution order.  At the same time, we understand it

7   would be standing by if put in front of the Court, but we

8   believe that the figure that we have proposed is, again, a

9   proveable, defensible calculation that is one that the Court

10  should have comfort in adopting in ordering this defendant to

11  pay.

12          THE COURT:  Ms. Colson.

13          MS. COLSON:  Thank you, your Honor.  I want to point

14  out Ms. Hutsona's husband, who's in the audience here today.

15          THE COURT:  Could I ask you to use the podium just to

16  make sure that I can hear you loud and clear.

17          MS. COLSON:  Sure.  Your Honor, I started off by

18  saying that Ms. Hutsona's husband is in the audience here

19  today.

20          Your Honor, it has been my great pleasure to represent

21  Ms. Hutsona for the past two years, and it is my pleasure to

22  stand with her today.  I want to start by reiterating to the

23  Court that she accepts full responsibility for her offense.

24  She is deeply ashamed to be here.  This is, as the Court knows,

25  not the first time she has appeared before a federal court for

N2SChutS

1    sentencing and it is absolutely humiliating for her to be in

2    this position again and with the press attention that this case

3    has drawn.

4              Importantly, given the seriousness of her crime, she

5    also recognizes the need for punishment and she knows that she

6    will be punished here today.  That said, she is not the same

7    person she was four years ago when she committed this crime and

8    she does not present the same recidivism risk that she did at

9    the time of her prior case in 2009.

10             She has taken and harnessed the shame and the

11   humiliation that she experienced as a result of this case to

12   propel herself forward and she is now living a productive and a

13   law abiding life, and she is doing that because she has

14   something to be proud of now.  She has a legitimate and a

15   thriving business she has built from the ground up and that she

16   can call her own.

17             And she is not running that business, your Honor, just

18   so she can live what the government calls a luxurious

19   lifestyle, she is using her business to lift other people up.

20   Between her two restaurants, she now employs more than 100

21   people, and many of whom who have criminal records or would not

22   be hired in more traditional work environments.  She has taken

23   them in and she has given them work, a reason to feel pride and

24   dignity in what they do.  Some of her employees have written to

25   the Court, and they universally describe her as hardworking, as

N2SChutS

1    competent, as thoughtful, and kind.  The people closest to her,

2    the ones who know her best are not focused on her lifestyle,

3    they are focused on the blood, sweat, and tears she had has put

4    into making sure that they have a job.

5          She also uses her platform to serve her community.

6    She is engaged in multiple community service projects and, as

7    just one example, each year during the holidays, the

8    restaurants collect gifts for children of incarcerated parents

9    and then they hand-deliver those gifts to the children's homes.

10   This year alone, her restaurants sponsored 200 needy children.

11         I know that it is difficult for this Court to

12   reconcile the person that Ms. Hutsona is today with the person

13   she used to be, and it is clear from the extremely detailed

14   letter that Joumana Kidd's counsel submitted in this case that

15   Ms. Kidd remains angry and hurt, as is expected and as is her

16   right, but I am respectfully asking this Court to take a more

17   balanced view.  Like all people, Ms. Hutsona is complicated.

18   She has made her share of mistakes, more than her share of

19   mistakes, but now there is no question that she is a force for

20   good in her community and her rehabilitation is an important

21   factor for this Court's consideration.  Indeed, it is one of

22   the chief goals of our criminal process.

23         Before I move on, I do feel compelled to point out

24   that the letter that was submitted by Ms. Kidd's counsel

25   contains various allegations that are not supported by the

N2SChutS

```
1    discovery, were not the subject of plea negotiations with the

2    government, and are not in the presentence report.  For

3    example, that Ms. Hutsona intercepted Ms. Kidd's mail or that

4    she used her health insurance or allegations about what she

5    does in her spare time.  Because those are not part of the

6    case, I don't feel it necessary to address them directly,

7    unless the Court has questions.

8         I will point out that as part of her bond, Ms. Hutsona

9    was permitted to travel between California and Arizona for

10   work — that's because she has a restaurant in each location.

11   And there was no expectation, I don't think, that she was

12   supposed to spend 24 hours a day at the restaurants.  So

13   certainly, at night when she is not at work, if she wants to

14   enjoy herself by going to a basketball game or attending a

15   party, I don't think that that was prohibited by her bond.

16        And also, to state I guess what is obvious, your

17   Honor, while Mr. Madison was once a prosecutor, he is not any

18   longer.

19        THE COURT:  You said you would only address it if I

20   wished to hear about it.  You addressed the Southern District

21   of California materials, but I would like you to just address

22   social media postings generally.  Mr. Capozzi just argued, as I

23   think counsel to the victim did, that they suggest that

24   Ms. Hutsona hasn't exactly treated this case with the

25   seriousness that it perhaps deserves, that combined with the
```

N2SChutS

1    fact that she seems to be making a healthy living but yet

2    hasn't made any restitution either to the victim in this case

3    or, perhaps even more significantly, much to the victims in her

4    prior case.  It seems to be of a piece.  I mean, could you

5    address that.  I think counsel of the victim suggests that she

6    lives in a $1.7 million home.  How do you square that with the

7    absence of any restitution or any effort to make the victims

8    whole?

9           MS. COLSON:  Your Honor, first off, I just want to

10   reiterate, given I have a two-year relationship with

11   Ms. Hutsona, she is taking this case very seriously.  She came

12   in and pled guilty and she is here to accept responsibility

13   today.  There is no question in my mind that she feels

14   significant remorse and, indeed, shame for her conduct.

15          With respect to her home, I don't know what it is

16   valued at, but she does not own the home, she rents the home

17   and pays approximately $5,000 in rent a month.

18          With respect to the social media postings, I would

19   just reiterate that I don't believe there was any expectation

20   on anybody's part that Ms. Hutsona was supposed to spend

21   24 hours a day at her restaurants.  She was traveling between

22   Arizona and California so that she could spend time at each one

23   of those restaurants, but the social media postings reflect

24   what she is doing after hours on her own time, and I don't see

25   them as a violation of her bond or necessarily as an indication

N2SChutS

1    that she is not accepting responsibility in this case.

2                THE COURT:  And the posting from Puerto Rico?

3                MS. COLSON:  Your Honor, the posting from Puerto Rico,

4    I should say that based on conversations with pretrial and with

5    Ms. Hutsona, my understanding is that she did seek permission

6    to go on the trip and then left for Puerto Rico prematurely

7    before permission was granted.  So in that sense, it was a

8    violation of her bond.

9                THE COURT:  I'm aware of that, that was brought to my

10   attention at the time, but the recommendation of pretrial was

11   not to take any action in connection with the violation, but

12   the video submitted by counsel seems to depict Ms. Hutsona

13   smoking marijuana there.

14               MS. COLSON:  I saw that video, your Honor.  I can't --

15   whatever you think of her smoking marijuana, I don't see how

16   that is in any way an indication that she hasn't accepted

17   responsibility for this offense.

18               THE COURT:  No one is saying it reflects on her

19   acceptance of responsibility, but it reflects on her compliance

20   with the terms of her release.

21                   In any event, the other allegation made in counsel's

22   letter is that after I adjourned sentencing based on the

23   representation that she needed to be treated for symptoms of

24   long COVID, that she was engaging in behavior that was not

25   exactly consistent with that.

N2SChutS

1          MS. COLSON:  Right.  I saw that, as well, your Honor.

2    Because I spoke with her doctor and I collected materials from

3    her doctor, my understanding of that situation was that she

4    does indeed have long COVID.  She was indeed receiving

5    treatment for long COVID at the time we requested that

6    adjournment.  In fact, the doctor advised her not to travel on

7    a plane across the country to New York, but there was no

8    suggestion that she had to remain home in bed.  Indeed, during

9    that time, she continued to go to work and to live her life.

10          THE COURT:  All right.  Carry on.

11          MS. COLSON:  Thank you, your Honor.

12          I do want to talk also about the impact of a lengthy

13   sentence on Ms. Hutsona's restaurants and on her employees.

14   She has been described as the backbone of this business.  She

15   is involved in all aspects of day-to-day operations, from

16   hiring staff, to communicating with vendors, to trainings, to

17   payrolls, to employee benefits, you name it.  She serves, she

18   buses tables, she washes dishes when necessary.  As the

19   government observes, her husband is involved.  He handles

20   upkeep and maintenance, but he does not deal with the

21   day-to-day operations.  They agreed from the very beginning to

22   divide their responsibilities and he acknowledged to me

23   yesterday that he simply doesn't know how to do the things that

24   she does, he has not been part of the day-to-day operations.

25   So the restaurants are at risk and her employees are at risk.

N2SChutS

1    If the restaurants close, more than 100 people will lose their

2    jobs.

3              Your Honor, in addition to the restaurants,

4    Ms. Hutsona has a 7-year-old stepson who she has helped to

5    raise.  She is not his only parent, but she plays a critical

6    role in her stepson's life.  And I think it goes without saying

7    that her sudden disappearance from his life could have serious

8    effects on him mentally and emotionally as he navigates his

9    pre-teen years.

10             Finally, your Honor, I would ask that you consider the

11   collateral consequences of conviction.  Most notably, the

12   incessant press coverage of this case.  There have been an

13   unusual number of articles, blogs, television profiles focused

14   on Ms. Hutsona since her arrest.  The tabloid reporters call

15   and email her every single day, they follow her to and from her

16   restaurants, they bother her staff, there have been hundreds of

17   negative reviews on Yelp, all of which cite to this case.

18   Someone even created an Instagram account that uses her

19   restaurant logo to lure people in and then says negative things

20   about her.  This is a relentless and seemingly orchestrated

21   effort to smear her and her business.  It has had a serious

22   effect on her, both on her business and on her mental health.

23   The government says that none of this is relevant to

24   sentencing, but I strongly disagree.

25             The case the government cites, *U.S. v. Cutler*, is very

N2SChutS

1    different from this case.  *Cutler*, the district court decided

2    to impose a probationary sentence.  It found that the public

3    humiliation that Cutler experienced was punishment enough and

4    that it would achieve specific deterrence, but this case is

5    different.

6          First of all, that case involved a $100-million fraud,

7    this case involves a $1-million fraud.  Second, we are not

8    arguing that the press attention on its own constitutes

9    sufficient punishment.  We are citing it in combination with

10   multiple other factors and noting the effect it has had on

11   Ms. Hutsona's mental health.  I finally just should note that

12   that case was decided in 2008 before the Second Circuit's 2009

13   decision in *Stewart*, which actually permits and encourages the

14   Court to consider collateral consequences.  So we believe this

15   is an appropriate factor for consideration and we would ask

16   your Honor to consider it in combination with the other factors

17   we have cited.

18         Your Honor, I just want to end with this.  Over the

19   past two years, Ms. Hutsona has shown that she can live a

20   productive and a law abiding life, and if you can find a way to

21   exercise some leniency for her, she is determined to continue

22   doing right by this Court.  Now, more than ever, she has a lot

23   on the line.  She wants to continue running her business, she

24   wants her business to survive, she wants to continue serving

25   her community, she wants to continue raising her son, and she

N2SChutS

| | |
|---|---|
| 1 | knows that in order to do these things, she must stay on the |
| 2 | right side of the law and she is committed to doing that. |
| 3 | Thank you. |
| 4 | THE COURT:  Thank you, Ms. Colson. |
| 5 | Just a brief housekeeping question.  Restitution and |
| 6 | forfeiture, I take it you have no opposition to the proposed |
| 7 | orders from the government? |
| 8 | MS. COLSON:  I have seen a restitution order from the |
| 9 | government, I don't believe I've seen a forfeiture order, but |
| 10 | the amounts of restitution and forfeiture were agreed upon in |
| 11 | the plea agreement. |
| 12 | THE COURT:  I think the forfeiture order is attached |
| 13 | to the government's submission and may even have been signed by |
| 14 | you and Ms. Hutsona. |
| 15 | MS. COLSON:  My apologies, your Honor.  If it was |
| 16 | already signed, then we must have done that before the plea. |
| 17 | THE COURT:  Looks like it was signed and dated in |
| 18 | July, so that seems to be correct.  Thank you. |
| 19 | Ms. Hutsona, I'll hear from you if you wish to say |
| 20 | anything before I impose sentence.  This is your opportunity to |
| 21 | do so.  Just please move the microphone close to you and speak |
| 22 | slowly and loudly. |
| 23 | THE DEFENDANT:  Your Honor, thank you for handling my |
| 24 | case.  I've heard everything and seen everything that you have, |
| 25 | and I know it's hard to believe, but I know that my conduct was |

N2SChutS

1    wrong and I -- I don't think I've ever regretted anything more

2    deeply.  I'm ashamed to be here.  And yes, the press attention

3    has been humiliating.  Nothing, though, has been more

4    humiliating than having to tell my daughter and my husband

5    about my wrongdoing.  I know I've hurt them and I've hurt so

6    many other people that don't deserve it.

7            And when I came out of prison in November of 2013, I

8    had these grand ideas of, like, how I was going to make up for

9    lost time with my kids and what I was going to do to avoid

10   recidivism, and I just kept hitting brick wall after brick

11   wall.  I got a job and then my probation officer came in, and

12   so the owner of the company saw that, I lost my job.  And I

13   used the skills that I kind of was learning there and I opened

14   my own company, Elite Lux Life.  I had several clients at Elite

15   Lux Life that were mostly pleased with my work and I -- it

16   doesn't excuse anything that I've done, but I do want the Court

17   to know that I did my work consistent of more than just working

18   for Joumana.  I feel like anything I say is going to be taken

19   like I'm a con artist and a liar, and it's not the case.  She's

20   not standing up, so I can't apologize, but I am very sorry to

21   Ms. Kidd for violating her trust.  I started to pay her back

22   and I'm looking forward to continuing that effort and I will

23   pay her back.

24           I mean, like I said, I know it's hard for anybody to

25   believe I'm a different person than I was four years ago.  My

N2SChutS

1  staff, my family, nobody knows this monster that's on paper and

2  it's being presented to the world and I do, but my staff

3  doesn't know that person and they're dealing with this every

4  single day.  All I can do -- I can't erase it.  I know I can't

5  erase it.  I can't take anything back.  I can just continue to

6  move forward with honesty and integrity.  I have no choice.

7  Everywhere I go, people -- I have a stigma on me now.  So

8  everything I do has to be in honesty, it has to be.

9         I recognize that I need to be punished and I'm ready

10  to accept the consequences.  I just -- I don't -- I don't know

11  what to say to try to have you understand that I'm really --

12  I'm really not that person anymore and I am very remorseful,

13  very remorseful, regardless of the people from my past that

14  have been dug up to say otherwise, they don't know who I am

15  today.  This is going to be the last time I'm in front of

16  anybody for anything like this.

17         That's all.

18         THE COURT:  Thank you, Ms. Hutsona.

19         Now, I will invite the victim or victim's counsel at

20  this time if you wish to be heard.

21         MR. LINNEMAN:  Very briefly, your Honor.

22         THE COURT:  If you could take the podium, please, and

23  identify yourself.

24         MR. LINNEMAN:  Thank you, your Honor.  Michael

25  Linneman of Quinn Emanuel Urquhart & Sullivan on behalf of

N2SChutS

1    Ms. Joumana Kidd, the victim in this action.

2            I want to address just a couple of very brief points.

3            Ms. Hutsona's counsel made an argument that someone

4    was orchestrating some sort of media effort.  I think this

5    strong implication is that it's Ms. Kidd.  I can tell you that

6    that is categorically false, it is simply not true.

7            And then there was also a statement that Ms. Hutsona

8    made that she had begun to pay Ms. Kidd back.  I'm not aware of

9    any of these payments.  She's not begun restitution.  It was

10   not included in any of her sentencing submissions, and that's

11   typically something that counsel will argue going into

12   sentencing.  So I guess that one was news to me.

13           THE COURT:  Let me say on that score, there's a

14   footnote in the presentence report, which I know you would not

15   have been privy to, that states that defense counsel provided

16   invoices totaling $21,000 and change, reflecting that

17   Ms. Hutsona paid a portion of the money referenced in the

18   personal plea agreement that had been entered, and that they

19   show monthly reimbursements in Ms. Hutsona's salary from

20   September 2018 to October 2019, and also supplied a video — I'm

21   not sure whether that would be in a series of text messages —

22   stating the cash payment of $30,000 was made by March 18th,

23   2019.  So I don't know if that's what Ms. Colson was referring

24   to, but just thought I would share that.

25           MR. LINNEMAN:  Your Honor, that was my mistake.  If

N2SChutS

1    that's what she was referring to, our understanding is that

2    those were actually offense proceeds and that she was merely

3    stealing more money from Ms. Kidd and then funneling it right

4    back to Ms. Kidd as part of, quote-unquote, payments in the

5    personal plea agreement.  So I don't think that those duly

6    count as restitution.

7          Otherwise, unless your Honor has any specific

8    questions, we're happy to rest on our letter.

9          THE COURT:  I guess the only question I have is the

10   restitution, and I certainly understand that you take the

11   position that it's higher than what the government is seeking.

12   I think under the law, if there is a dispute, it may well be

13   that you'd be entitled to a hearing on that.  Mr. Capozzi

14   indicated he didn't think you wanted a hearing, but I wanted to

15   hear your thoughts on that.

16         MR. LINNEMAN:  We would not seek a hearing.

17         THE COURT:  Does your client wish to be heard or is

18   she merely being heard through you?

19         MR. LINNEMAN:  I think she's just being heard through

20   me.  Thank you, your Honor.

21         THE COURT:  Thank you for being here and thank you for

22   your remarks.

23         Counsel, do either of you wish to respond or can we

24   proceed?

25         MR. CAPOZZI:  Nothing further from the government,

N2SChutS

1    your Honor.

2              THE COURT:  Ms. Colson.

3              MS. COLSON:  No.  Just to note that when Ms. Hutsona

4    referred to beginning to pay Ms. Kidd back, she was making

5    reference to the reductions from her salary and the other

6    receipts that she provided.

7              THE COURT:  Counsel, is there any reason why sentence

8    cannot be imposed at this time?

9              MR. CAPOZZI:  No, your Honor.

10             MS. COLSON:  No, your Honor.

11             THE COURT:  In imposing sentence, I am required to

12   consider the factors that are set forth in 18, United States

13   Code, Section 3553(a).  They include:

14             First, the nature and circumstances of the offense and

15   the history and characteristics of the defendant;

16             Second, the need for the sentence imposed to advance

17   the purposes of sentencing, namely to reflect the seriousness

18   of the offense and promote respect for the law and to provide

19   just punishment for the offense, to afford adequate deterrence

20   to criminal conduct, to protect the public from further crimes

21   of the defendant, and to provide the defendant with needed

22   education or vocational training, medical care, or other

23   correctional treatment in the most effective manner;

24             Third, the kinds of sentences available;

25             Fourth, the guidelines range, which I have found to be

N2SChutS

1    41 to 51 months' imprisonment;

2              Fifth, any pertinent policy statement;

3              Sixth, the need to avoid unwarranted sentencing

4    disparities among similarly situated defendants; and

5              Seventh, the need to provide restitution to any

6    victims of the offense.

7              Ultimately, I am required to impose a sentence that is

8    sufficient but no greater than necessary to comply with the

9    purposes of sentencing that I mentioned a moment ago.

10             Now, I am persuaded that there is a need for a

11   substantial sentence here.  Number one, the conduct, the

12   offense conduct itself is serious, even I would describe it as

13   despicable conduct.  Ms. Hutsona preyed on a vulnerable victim,

14   a single mom that was undergoing cancer treatment no less.

15   That conduct occurred over a significant length of time.  She

16   essentially took advantage of the cultivation of what appeared

17   to be a close relationship, even a friendship, notwithstanding

18   the employment relationship, and making matters worse, in an

19   effort perhaps to cover her tracks, raided apparently an

20   account belonging to the victim's 88-year-old aunt and the

21   victim's children's college funds.  Making matters worse, that

22   conduct continued even after she had been caught in the act and

23   confessed to the act and entered what has been referred to as a

24   private plea agreement, and after being terminated, continued

25   to take steps to conceal her crimes by forging the victim's

N2SChutS

signature on the power of attorney form.  Moreover, much like
in 2009, this was not done out of desperation, not that that
would excuse it, but rather to fund what either was or appeared
to be a lavish lifestyle to others and, in that sense, that
compounds the nature of the conduct.

On top of that, this is not Ms. Hutsona's first
criminal conviction.  She has fraud convictions going back to
the 1990s.  She has received not one, but two substantial
sentences, including a 75-month sentence in 2009, and yet those
sentences did not deter her from continuing the crimes that she
committed here.  And again, making matters worse, that happened
even while she was on supervised release and, more to the
point, happened within months I think of her making a motion
for an early termination of supervised release in that case,
claiming that she had been a model supervisee and,
quote-unquote, fully complied with the terms of her supervised
release and had fully obeyed the law.

Now, the fact that this is a pattern, a pattern that
seems to go back at least to 2007, 2008, arguably back until
the '90s is certainly significant to the history and
characteristics of the defendant.  Indeed, to read the
sentencing transcript from 2009, it is a feeling of déjà vu all
over again.  Same arguments are made for Ms. Hutsona's mercy,
same statements are made by Ms. Hutsona about her future
conduct, and yet, here we are.

N2SChutS

1          All of that leads me to think that Ms. Hutsona is

2     indeed a serial fraudster, a serial con artist, as she put it,

3     and that the risks of recidivism are exceedingly high and a

4     substantial sentence is warranted both to protect the public

5     from further crimes of the defendant and to deter the defendant

6     from committing more crimes, if perhaps another sentence would

7     do that.

8          Now, to me, Ms. Hutsona's actions speak louder than

9     her words.  I'll refer in that regard to the lifestyle that is

10    depicted in the social media posts that were submitted to me,

11    but the fact that she is living that lifestyle, that she is

12    paying $5,000 in rent every month, that she has two seemingly

13    successful businesses — and I'll have more to say on that in a

14    moment — but has made no effort to repay the victim in this

15    case and little or no effort to repay the victims from her 2008

16    case, to me, speaks louder than perhaps anything.

17         Now, I certainly commend her acts of charity, I

18    commend her husband' acts of charity, but the fact they're

19    giving money to others without trying to make her victims whole

20    in the first place is concerning to me and reflects on her

21    acceptance of responsibility, even if it doesn't undermine the

22    case from the guidelines reduction.

23         Now, long story short, Ms. Hutsona certainly says the

24    right things here today, but she did in 2009, as well, and I'm

25    concerned it's more reflection of her savvyness and

N2SChutS

1    understanding that that's what you say when you're being

2    sentenced by a judge for fraud.  At this point, in her career,

3    at this point, given the record that she has amassed, I think

4    the benefit of the doubt has to go toward the risk of

5    recidivism, has to go toward protecting the public from further

6    crimes, and has to go toward deterrence.  So that is where I

7    come out.

8         Let me say a brief word about the defense arguments

9    for mitigation.  I certainly commend Ms. Colson on her

10   representation and her submission, both of which were

11   characteristically good.  Having said that, I'm not persuaded

12   or particularly moved by the arguments that are made.

13        I will say, Ms. Hutsona, I commend you on your conduct

14   in running the two restaurants and starting that company and

15   contributing to those communities and the lives of your

16   employees, and the letters from your employees are especially

17   noteworthy in that regard, and I give you full credit for that.

18   Having said that, it should not go without saying that my

19   understanding is, and I haven't heard anything to the contrary,

20   that those businesses were funded with ill gotten gains with

21   some of the victims' money in this case.  In other instances, I

22   could imagine the government seeking to forfeit the businesses,

23   and they've not done that here, but I certainly think it would

24   be somewhat perverse to rely on them as a basis for significant

25   mitigation.

N2SChutS

1          Now, I should also say that it gives me no pleasure to

2    impose a sentence that might jeopardize those businesses, let

3    alone the livelihoods of people who work there, but it is not

4    lost on me that your husband co-owns them and runs and has

5    significant responsibilities for them.  On top of that, you and

6    he have had since last February, since your arrest in this case

7    and since last July when you pleaded guilty, to take steps to

8    make the necessary arrangements to ensure that they continue

9    without you.

10          Now, with respect to Ms. Hutsona's relationship to her

11    stepson.  I certainly commend her on what seems to be a strong

12    relationship there, but I don't find that as compelling as, for

13    example, a child who might lose his or her only parent.  Here,

14    there seems to be another parent, aside from Mr. Hutsona, who

15    will continue to be involved in that child's life, and in that

16    sense, I don't think it's quite the same.

17          Finally, with respect to the collateral consequences

18    from the media attention, I come down somewhere between the

19    defense and the government, which is to say I don't think it's

20    categorically irrelevant.  I would think that media attention

21    and the like is relevant, for instance, to deterrence in some

22    instances, which is to say it can be a relevant consideration,

23    but I don't find it's a particularly significant factor to be

24    considered here.  The fact of the matter is the media attention

25    that Ms. Hutsona has gotten has been a product of her conduct,

N2SChutS

1    not just in this case, but over the last 20 or 30 years, and in

2    that regard, has no one to blame but herself, and there is some

3    perversity to the argument that the more notorious the crime,

4    the less time the defendant should receive because it is more

5    likely to get attention from the media — that's not a very

6    compelling argument to me.

7          Having said all of that, I will state the sentence

8    that I intend to impose.

9          Ms. Hutsona, I would ask you to please rise.

10         Ms. Hutsona, it is the judgment of this Court that you

11   are remanded to the custody of the Bureau of Prisons for a

12   period of 51 months, that is four years and three months, to be

13   followed by a period of 3 years of supervised release.

14         During your term of supervised release, you will be

15   subject to the mandatory conditions that are set forth on

16   page 37 of the presentence report.  In addition to those, you

17   shall satisfy your financial obligations, which I will discuss

18   shortly, including complying with any installment schedules

19   that I impose.

20         The standard conditions of supervised release, which

21   are set forth on pages 37 to 39 of the presentence report, and

22   will be in the judgment, shall also apply.

23         Finally, you must meet the following special

24   conditions at page 39 of the presentence report, as well as one

25   additional one, which is that you shall not have any contact,

N2SChutS

1    direct or indirect, with the victim in this case or members of

2    her family unless you receive her consent through her counsel

3    to do so.

4            In addition, I impose and order you to pay a fine in

5    the amount of $10,000, which shall be due and payable within

6    30 days of your release from incarceration.  I will order you

7    to pay restitution in the amount of $1,148,759.28 in accordance

8    with the restitution order that the government has submitted

9    that I will sign and pursuant to the terms set forth in that

10   order, again, $1,148,759.28.  I will waive interest under

11   section 3664(f)(3) in light of your financial circumstances and

12   the size of that restitution order, and the fact that much of

13   your restitution is still to be paid in connection with your

14   2009 sentence.  I am imposing the mandatory special assessment

15   of $100, which shall be due and payable immediately.  And I

16   will sign the forfeiture order that the government submitted on

17   consent pursuant to which you are ordered to forfeit to the

18   United States, I think the same amount of restitution,

19   $1,148,759.28, which represents the proceeds that you obtained

20   directly or indirectly as a result of your criminal activity.

21           Does either counsel know of any legal reason why this

22   sentence should not be imposed as stated?

23           MR. CAPOZZI:  No, your Honor.

24           MS. COLSON:  No, your Honor.

25           I do want to clarify one thing for the record, because

N2SChutS

1    I think there was some suggestion by the Court that Ms. Hutsona
2    had funded her business with money stolen from Ms. Kidd.
3    That's not exactly what the government's letter said.  What the
4    government's letter said is that she was using at least one of
5    the accounts to pay expenses for the business.  There was no
6    suggestion that the initial capital investment was made with
7    money from the fraud accounts.  When I did speak to Mr. Capozzi
8    about that statement, because there was no cite to back it up,
9    he referred me to an affidavit that was filed in a case in
10   Florida in which some receipts for the business had been -- to
11   which some receipts for the business had been appended, and he
12   specifically referred me to one marketing expense for the
13   business that I believe was somewhere between $500 and $600.
14   So the statement that she was using the fraud accounts to pay
15   expenses for that business I believe comes down to one expense
16   in the amount of $500 or $600.  I don't know that that would
17   make any difference in your Honor's sentence, but I just did
18   want to point that out and clarify for the record that there
19   was no suggestion, again, that any initial capital investment
20   or any significant expenses had been made with the fraud
21   accounts.
22        THE COURT:  I appreciate that.  It doesn't make a
23   difference to my sentence, but having said that and for the
24   sake of the record, not only is there that reference, but on
25   page 4 of counsel to the victim's letter, it states that

N2SChutS

1    Ms. Hutsona's restaurant was "started with the victim's credit

2    card."  I don't know if counsel wishes to be heard on that or

3    if you have a response to that, but there was certainly no

4    dispute or no response to it, which is part of what I was

5    referring to.

6           MS. COLSON:  Your Honor, I believe that that also

7    doesn't have a cite to it.  As I said, there were multiple

8    allegations made in that letter that were not the subject of

9    discovery or any discussions with the government.

10          THE COURT:  In any event, I appreciate your making the

11   record clearer, perhaps, but it doesn't make a difference to my

12   sentence, among other things, the financial circumstances that

13   led her to steal over $1 million from the victim in this case,

14   and I find it hard to believe that some of that money didn't go

15   toward forming the business that she started at or about the

16   same time.  So it stands to reason that it sounds like at least

17   some of the expenses are traceable to it, but at the end of the

18   day, it doesn't make a huge difference to my valuation of the

19   sentencing factors.

20          The sentence as stated is imposed.  I find that

21   sentence is sufficient but no greater than necessary to satisfy

22   the sentencing purposes set forth at Section 3553(a)(2),

23   including the need and especially the need to promote respect

24   for the law, to provide just punishment for the offense, to

25   afford adequate deterrence and, perhaps most importantly, to

1    protect the public from further crimes of the defendant.

2            Ms. Hutsona, I want to believe you, I want and hope

3    that when you sit before me, not so dissimilarly to your

4    sitting before a judge in California in 2009 and you tell me

5    that this was the last time you're going to be found in a court

6    that for the sake of your kids, for the sake of your family,

7    you want to put this all behind you and devote yourself to law

8    abiding conduct, I want to believe you, but the record doesn't

9    give me a whole lot of hope.

10           Now, I certainly hope that the rewards that you have

11   gotten from running your businesses the last couple of years,

12   the ways in which you've contributed to your communities, the

13   way in which you've contributed to the lives of your employees,

14   that when you get out and you serve your time, and I do think

15   the time you will serve is appropriate for your crimes, that

16   that will loom larger and that you will be able to go back to

17   that conduct and not end up in front of me or in front of

18   another judge.

19           I assure you if you violate the terms of your

20   supervised release as you did with respect to the supervised

21   release imposed in 2009 and you end up back in front of me for

22   it, I'm not going to look kindly on it, given your record here,

23   given what I've had to say already, I will not look kindly on

24   it and you can rest assure that you may well go back to prison

25   and serve additional time.  I don't mean just significant

N2SChutS

1    things like fraud, I mean other things, as well.  The conduct

2    displayed in those social media posts certainly suggests to me

3    that you have not taken as seriously as you should the

4    conditions of your release.  You appear to have gone to

5    Los Vegas without permission to go to Las Vegas, you appear to

6    have smoked marijuana in Puerto Rico without permission to go

7    there, let alone commit a felony there.  Long story short, you

8    better comply with the terms of your supervised release.  If

9    you end up back in front of me, notwithstanding the comments

10   you've made to me today, you can rest assure I'm not going to

11   look kindly on that.

12          Now, with that, Ms. Colson, do you have any requests

13   for recommendation to designation?

14          MS. COLSON:  Yes, your Honor.  There is a facility in

15   Phoenix.  I just want to check with Ms. Hutsona to make sure I

16   have the name correct.  It's the federal prison camp for women

17   in Phoenix.  Should your Honor make that recommendation, that

18   would obviously allow her to serve her sentence close to home.

19          THE COURT:  I will certainly recommend that she be

20   designated to a facility as close to the Phoenix area as

21   possible to facilitate the maintenance of ties to her family

22   and, if appropriate, the federal prison camp in and around

23   Phoenix.  Ultimately, as you know, that's up to the Bureau of

24   Prisons.

25          MS. COLSON:  Your Honor, I would also ask that you

N2SChutS

1  recommend Ms. Hutsona for the RDAP program based on her

2  representations to probation during her presentence interview

3  that she was drinking more than she thought was appropriate and

4  also using marijuana.

5       THE COURT:  I will make that recommendation, as well.

6  And urge you, Ms. Hutsona, to make the best of your time while

7  in custody not only to get whatever drug treatment may be

8  available, but to participate in any other programs as I gather

9  you did in your last stint that might better the lives of other

10  people, but not to mention your own.

11       Mr. Capozzi, I assume the government moves to dismiss

12  all open counts at this time?

13       MR. CAPOZZI:  Yes, your Honor.

14       THE COURT:  Motion is granted.

15       Ms. Hutsona, to the extent that you do not give up

16  your right to appeal through your guilty plea and the agreement

17  that you entered into in connection with your plea, you do have

18  the right to appeal.  Any notice of appeal must be filed within

19  14 days of entry of the judgment.  If you cannot afford to pay

20  the costs of appeal, you may apply for leave to appeal *in forma*

21  *pauperis*.

22       Mr. Capozzi, what's the government's position on

23  voluntary surrender versus remand?  Certainly has some

24  instances of failure to appear in the past, but are in the

25  past, and has appeared for all proceedings here.  So what's

N2SChutS

1   your position?

2           MR. CAPOZZI:  Your Honor, the government is not

3   seeking remand today.  Your Honor, we do think it's appropriate

4   that the Court make clear to the defendant that the analysis

5   will change at any point if, before her surrender date, there

6   is evidence of any misconduct.

7           THE COURT:  I will allow Ms. Hutsona to voluntarily

8   surrender.

9           Ms. Colson, any views on a date or should I just

10  exercise my discretion to set one?

11          MS. COLSON:  Six weeks, your Honor, if that's

12  possible.

13          THE COURT:  I think that's standard.  I will give

14  Ms. Hutsona until April 13th to surrender to the institution

15  designated by the Bureau of Prisons.  She is to surrender by

16  2:00 p.m. on that date to that facility or as notified by

17  probation or pretrial.  I would assume that the designation

18  would occur well before then and if, for some reason, it has

19  not, counsel should seek an appropriate extension and,

20  Mr. Capozzi, you should look into the matter.

21          Ms. Hutsona, let me stress two things to you.  First,

22  if you do not surrender as directed, you will be in a world of

23  trouble, and I could assure you that you will receive

24  additional punishment and would be subject to prosecution for

25  crimes separate and apart from those that you've been punished

N2SChutS

1    for today.

2              Do you understand that?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  Second, the conditions of your release

5    until now will continue to apply until you surrender for your

6    sentence.  You should understand that if you violate any of

7    those conditions, it could have an immediate effect on your

8    release, which is to say you could be remanded immediately, not

9    to the facility to which you're designated, but to the MDC for

10   transfer by the Bureau of Prisons to whatever facility you're

11   designated to.  I assure you that you don't want that to

12   happen.  So that means that you, for the next six weeks, better

13   observe every I, T, every line of your release conditions and

14   ensure that you don't commit any violations, small, large,

15   medium.

16             Do you understand that?

17             THE DEFENDANT:  Yes, your Honor.

18             MS. COLSON:  Ms. Hutsona is making sure she's still

19   permitted to travel between both restaurants.  She has one in

20   San Diego and one in Arizona.

21             THE COURT:  My understanding is the terms of the

22   release is you are permitted to travel in the Southern District

23   of California for purposes of work.  So that condition remains

24   in effect.

25             Anything else, Mr. Capozzi?

N2SChutS

1          MR. CAPOZZI:  No, your Honor.

2          THE COURT:  Ms. Colson?

3          MS. COLSON:  No.  Thank you.

4          THE COURT:  We are adjourned.  Thank you very much.

5                              *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(213) 443-3150**

WRITER'S EMAIL ADDRESS
**stevemadison@quinnemanuel.com**

March 10, 2023

**VIA EMAIL**

Timothy V. Capozzi, Esq.
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007

Re:    *United States v. Tracii Show Hutsona*, 21-cr-299-JMF (S.D.N.Y. 2021)

Dear AUSA Capozzi:

As you know, at her sentencing in the above-refenced case last week, Judge Furman admonished Ms. Hutsona for her "despicable conduct," expressed his concern that she will not be deterred from this her most recent conviction, and emphasized that until she self-surrenders on April 13, Ms. Hutsona must not "commit any violations, small, large, medium." Regrettably, within a few days, Ms. Hutsona appears to have reverted to victim-blaming and posting personal identifying information of Ms. Kidd and her family, in violation of her terms of release.[1] Ms. Hutsona and her husband, Derrell Hutsona, have taken to social media to, *inter alia*, harass Ms. Kidd and publicly post personal identifying information. These actions violate her conditions of release in that they contain Ms. Kidd's and her family's personally identifying information and are unauthorized contact with Ms. Kidd. The purpose of this letter is to bring Ms. Hutsona's latest conduct to the attention of the U.S. Attorney's Office and the Court.

---

[1]   Because the Court gave Ms. Hutsona until April 13 to report, the terms and condition of her pre-trial release remain in full force and effect until she reports.

quinn emanuel urquhart & sullivan, llp

ATLANTA | AUSTIN | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

On March 4, 2023, Ms. Hutsona posted several images on her Instagram account.  Exs. 1(a)–(b).[2]  In the caption, Ms. Hutsona states, in part, "Break it down: Enormous child support payments will stop at 18 y/o unless your kids are in college.  So, let's move some college funds around to make it look there's some education happening."  Ex. 1(a).  In one image, Ms. Hutsona posted a screenshot of transactions from Ms. Kidd's niece's 529 college funds.[3]  Ex. 1(b).  In another image, Ms. Hutsona posts a conversation with Ms. Kidd dating back to October 2018.  Ex. 1(a).  **This conversation contains the login and password information to accounts (which Ms. Hutsona failed to completely redact) and the account numbers for two of Ms. Kidd's children's 529 college funds**.  *Id.*  In her comment accompanying the post, Ms. Hutsona states, "I'm not claiming to be completely innocent, but I pled guilty to avoid a circus, and got one anyway."[4]  Ex. 1(c).

On or about March 4, 2023, Derrell Hutsona re-posted Ms. Hutsona's post onto his Facebook page.  Ex. 2.  In the post, Mr. Hutsona falsely claims that Ms. Hutsona's conduct had "[n]othing to do with our restaurants!!"—squarely refuting one of the Court's findings.  *Id.*; *cf.* Feb. 28, 2023 Sentencing Tr., at 36:18–21 ("Having said that, it should not go without saying that my understanding is, and I haven't heard anything to the contrary, that those businesses were funded with ill-gotten gains with some of the victims' money in this case."); at 41:10–91 ("THE COURT: In any event, I appreciate your making the record clearer, perhaps, but it doesn't make a difference to my sentence, among other things, the financial circumstances that led her to steal over $1 million from the victim in this case, and I find it hard to believe that some of that money didn't go toward forming the business that she started at or about the same time. So it stands to reason that it sounds like at least some of the expenses are traceable to it, but at the end of the day, it doesn't make a huge difference to my valuation of the sentencing factors.").

On March 6, 2023, Ms. Hutsona posted a text-message conversation between herself and Ms. Kidd.  Ex. 3.[5]  Included in this post is a portion of a picture of a check from Ms. Kidd.  Ms. Hutsona barely redacted the account number and some numbers are visible.  *Id.*  On March 7, 2023, Ms. Hutsona posted a screenshot of a news article relating to Ms. Kidd's divorce.  Ex. 4.[6]  One

---

[2]  As of the writing of this letter, the post is publicly available at https://www.instagram.com/p/CpX_iJopUUe/. For your convenience, we enclose copies of the offending posts.

[3]  It appears that Ms. Hutsona may have edited the conversation to make it appear as though Ms. Hutsona and Ms. Kidd were discussing Ms. Kidd's children's 529 college accounts when they were in fact discussing Ms. Kidd's *niece's* 529 college accounts.

[4]  This statement appears to be directly at odds with Ms. Hutsona's sworn statements during her allocution and sentencing.

[5]  As of the writing of this letter, the post is publicly available at https://www.instagram.com/p/Cpa_XekyU8M/.

[6]  As of the writing of this letter, the post is publicly available at https://www.instagram.com/p/Cpd3OuSP00B/.

individual commented ominously, "She's a fame seeker!!!! Hope she's prepared for what's coming!" *Id.*

On March 9, 2023, Ms. Hutsona posted again on Instagram. Ex. 5. Here, she attempts to disclaim that she forged a power of attorney. *Id.* While Ms. Hutsona blurs Ms. Kidd's address, she failed to redact Ms. Kidd's account number. *Id.*

These posts are clearly intended to harass the victims of Ms. Hutsona's crimes, Ms. Kidd and her family. Ms. Hutsona repeatedly stole from Ms. Kidd for years and now continues to revictimize her. Ms. Hutsona is now attempting to blame Ms. Kidd for her own conduct for which she pled guilty. Some of Ms. Hutsona's followers are taking Ms. Hutsona's bait. One threatened Ms. Kidd by stating that she "[h]ope[s] [Ms. Kidd]'s prepared for what's coming!" These actions are further compounded by the fact that Ms. Hutsona has posted personally identifying information about Ms. Kidd and her family. Ms. Hutsona posted the account numbers for Ms. Kidd's niece's accounts. Ex. 1(a). These are public posts, now exposing these accounts to identity theft. Further, Ms. Hutsona failed to redact the full password for these accounts, further compromising them. *Id.* Ms. Hutsona posted a series of transactions that occurred within these accounts. Ex. 1(b). Ms. Hutsona also posted a check from Ms. Kidd without fully redacting the account number. Ex. 3. Finally, Ms. Hutsona posted an image of the power attorney she forged without redacting Ms. Kidd's bank account number. Ex. 5.

These action appear to clearly violate Ms. Hutsona's conditions of release. Ms. Hutsona is "not to possess ***any*** personal identifying information of others except immediate family members." *United States v. Tracii Show Hutsona*, Dkt. 17, at 5 (emphasis added). Not only has Ms. Hutsona improperly retained Ms. Kidd's and her family's personal identifying information, she is now posting it publicly. Additionally, Ms. Hutsona is "to have no contact, direct ***or indirect***, with 'Victim 1' described in complaint without prior approval of PTS." *Id.* These posts are clearly designed to reach Ms. Kidd, Victim 1. After Ms. Hutsona's social media activity was reviewed and discussed during her sentencing, Ms. Hutsona is clearly aware that her public social media postings are improper. Clearly, as the Court observed, the only way to stop Ms. Hutsona from her improper conduct is to place her in custody. *See* Feb. 28, 2023 Sentencing Tr., at 46:12–15 ("So that means that you, for the next six weeks, better observe every I, T, every line of your release conditions and ensure that you don't commit any violations, small, large, medium."). We respectfully request that you docket an *ex parte* application and/or a motion on shortened time to revoke Ms. Hutsona's bond and remand her forthwith.

Thank you for your consideration of this request, and if any further information is needed, please advise.

Respectfully submitted,

_____

Steven G. Madison
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Michael Linneman
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Joumana Kidd*

SGM:wp
enclosures





Ex. 1(b) to Ex. B

officiallythutt · Follow

officiallythutt Now that the sentence has been imposed, it's important to show some facts that have been omitted from this circus.... I am absolutely remorseful for my part in this, but the embellishments and outright lies have become a sideshow at my and my family's expense. Let's get started....
Does this look like the victim doesn't know what's happening? Break it down: Enormous child support payments will stop at 18 y/o unless your kids are in college. So, let's move some college funds around to make it look like there's some education happening.

4d

sierrantoinette ❤️ ❤️ ❤️
3d  1 like  Reply

75hellcat Good 4 you, the truth must be uncovered.
3d  2 likes  Reply

jennyvaishali BOOM!!! 🗣️CAN I SHARE THIS!!!!
3d  1 like  Reply

mom_gma_boss_selfmade I was waiting for all this to

296 likes
4 DAYS AGO

Add a comment...                                    Post



Ex. 2 to Ex. B

**4:45**  📶 **5G** 🔋



## Derrell Hutsona
25m · 👥

Does it look like the "VICTIM" is pure as snow? Were TIRED of all the LIES!!!! my wife took a plea for what she was sorry to be a part of! Nothing to do with our restaurants!! She has a past and so she is perfect to continue LYING about. She took a plea for far less than the story that's painted & now its on record that we've proven our restaurants werent started with anything to do with this.  Why all the EXXXXTRA THO??🤷🏾‍♂️

Now we can release these TEXT......









